## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re Automotive Parts Antitrust Litigation | Master File No. 2:12-md-02311 |
| In re: Alternators<br>In re: Starters | Class Case No. 2:15-cv-00707<br>Class Case No. 2:15-cv-01107 |
| This document relates to: | Case No. 2:15-cv-14096 |
| Rush Truck Centers of Alabama, Inc; Rush Truck Centers of Arizona, Inc.; Rush Truck Centers of California, Inc.; Rush Truck Centers of Colorado, Inc.; Rush Truck Centers of Florida, Inc.; Rush Truck Centers of Georgia, Inc.; Rush Truck Centers of Idaho, Inc.; Rush Truck Centers of Illinois, Inc.; Rush Truck Centers of Indiana, Inc.; Rush Truck Centers of Kansas, Inc.; Rush Truck Centers of Missouri, Inc.; Rush Truck Centers of Nevada, Inc.; Rush Truck Centers of New Mexico, Inc.; Rush Truck Centers of North Carolina, Inc.; Rush Truck Centers of Ohio, Inc.; Rush Truck Centers of Oklahoma, Inc.; Rush Truck Centers of Oregon, Inc.; Rush Truck Centers of Tennessee, Inc.; Rush Truck Centers of Texas, LP.; Rush Truck Centers of Utah, Inc.; Rush Truck Centers of Virginia, Inc., *on behalf of themselves and all others similarly situated,*<br><br>          Plaintiffs,<br><br>     v.<br><br>Mitsubishi Electric Corporation; Mitsubishi Electric Automotive America, Inc.; Hitachi, Ltd.; Hitachi Automotive Systems, Ltd.; Hitachi Automotive Systems Americas, Inc.; Mitsuba Corp.; American Mitsuba Corporation; Robert Bosch GmbH; and Robert Bosch LLC<br><br>          Defendants. | **Jury Trial Demanded** |

## TRUCK AND EQUIPMENT DEALERS FIRST AMENDED
## CLASS ACTION COMPLAINT

DM1\7333972 1

PLAINTIFFS Rush Truck Centers of Alabama, Inc. ("Rush AL"), Rush Truck Centers of Arizona, Inc. ("Rush AZ"), Rush Truck Centers of California, Inc. ("Rush CA"), Rush Truck Centers of Colorado, Inc. ("Rush CO"), Rush Truck Centers of Florida, Inc. ("Rush FL"), Rush Truck Centers of Georgia, Inc. ("Rush GA"), Rush Truck Centers of Idaho, Inc. ("Rush ID"), Rush Truck Centers of Illinois, Inc. ("Rush IL"); Rush Truck Centers of Indiana, Inc. ("Rush IN"); Rush Truck Centers of Kansas, Inc. ("Rush KS"), Rush Truck Centers of Missouri, Inc. ("Rush MO"), Rush Truck Centers of Nevada, Inc. ("Rush NV"), Rush Truck Centers of New Mexico, Inc. ("Rush NM"), Rush Truck Centers of North Carolina, Inc. ("Rush NC"), Rush Truck Centers of Ohio, Inc. ("Rush OH"), Rush Truck Centers of Oklahoma, Inc. ("Rush OK"), Rush Truck Centers of Oregon, Inc. ("Rush OR"); Rush Truck Centers of Tennessee, Inc. ("Rush TN"); Rush Truck Centers of Texas, LP ("Rush TX"); Rush Truck Centers of Utah, Inc. ("Rush UT"); and Rush Truck Centers of Virginia, Inc. ("Rush VA"), (collectively "Plaintiffs") file this Complaint on behalf of themselves and all other similarly situated dealers (the "Classes" as defined below) of medium-duty (Class 3, 4, 5, 6, & 7) trucks and heavy-duty (Class 8) trucks, buses, commercial vehicles (excluding automobiles, light trucks, vans, sports utility vehicles, and/or similar motor vehicles sold by automobile dealers), construction equipment, mining equipment, agricultural equipment (including ATVs designed and/or marketed for agricultural use), railway vehicles, materials handling vehicles, and other similar vehicles (collectively, "Trucks and Equipment" or "Vehicles").

Plaintiffs bring this class action for damages, injunctive relief, and other relief pursuant to federal antitrust laws and state antitrust, unfair competition, unjust enrichment and consumer protection laws, demand a trial by jury, and allege as follows:

**NATURE OF ACTION**

1.      Plaintiffs bring this lawsuit as a proposed class action against Defendants (defined below), manufacturers and suppliers of Alternators and Starters (defined below) globally and in the United States, for engaging in a lengthy conspiracy to suppress and eliminate competition in the vehicle parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the price of Alternators and Starters, which were sold to Truck and Equipment manufacturers in the United States and elsewhere.  The Defendants' conspiracy successfully targeted the United States' Truck and Equipment industry, raising prices for Truck and Equipment manufacturers and dealers alike.

2.      Plaintiffs bring this action on behalf of themselves and all Truck and Equipment dealers that, during the period June 1, 2000, to the present, (the "Class Period"):

(a) purchased Alternators or Starters manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator, or

(b) purchased Trucks or Equipment containing Alternators or Starters manufactured by one of the Defendants or any current or former subsidiary, affiliate or co-conspirator.

3.      "Alternators" are devices that charge a vehicle's battery and power the electrical system of a vehicle when its engine is running.  If the Alternator is not working properly, the battery will eventually lose its charge and all electrical systems in the vehicle will stop working; this includes starting the vehicle.

4.      "Starters" or "Starter Motors" are devices that power a vehicle's battery to "turn over" and start when the driver turns the ignition switch.  When a Starter is damaged, a vehicle will not turn on.

DM1\7333972 1

5.      Defendants Hitachi, MELCO, Mitsuba, Mitsubishi, and Bosch (defined below and collectively "Defendants") manufacture, market, and sell Alternators and Starters throughout the United States and in other countries.  The manufacture and sale of Alternators and Starters is a multi-million dollar industry.

6.      Trucks and Equipment containing Alternators and Starters, as well as Alternators and Starters themselves, made by Defendants, are sold in every state of the United States and the District of Columbia.

7.      Defendants and other co-conspirators (as yet unknown) agreed, combined, and conspired to rig bids for, and to fix, stabilize, and maintain the prices of Alternators and Starters.

8.      The U.S. Department of Justice's ("DOJ") Antitrust Division is currently conducting a broad criminal investigation into illegal price-fixing and bid-rigging in the automotive parts industry.  As part of its criminal investigation, the U.S. Department of Justice ("DOJ") is seeking information about unlawful anticompetitive conduct in the markets for a number of different vehicle parts, and the Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out in the offices of a number of major companies in the industry.  The European Commission Competition Authority ("EC") has also conducted raids at the European offices of several of the Defendants.  The vehicle parts investigation is the largest criminal investigation the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the allegedly illegal conduct.  The ongoing cartel investigation of price-fixing and bid-rigging in the vehicle parts industry has yielded approximately $2.5 billion in criminal fines.

DM1\7333972 1

9.    Competition authorities in Japan, and possibly elsewhere, have been investigating a conspiracy in the market for Alternators and Starters since at least July 2012.  The Japanese Fair Trade Commission ("JFTC") has raided the offices of the Defendants.

10.    On November 22, 2012, the JFTC imposed $41.3 million in fines against various vehicle parts manufacturers, including a $17.2 million against Defendant Mitsubishi Electric Corporation, for violating antitrust laws by forming a cartel to fix prices for automotive parts including Alternators and Starters.  That same day, the JFTC announced that it would issue cease-and-desist orders against the violating companies that would require the companies to:  (1) immediately pass resolutions that they would stop any illegal conduct; (2) contact any automobile maker who might have purchased their parts through collusive bidding processes; and (3) implement employee compliance programs.  According to the JFTC, fellow conspirators Hitachi Ltd., and Hitachi Automotive Systems, Ltd. also violated antitrust laws.

11.    Defendant Hitachi Automotive Systems, Ltd. agreed to plead guilty and to pay a $195 million fine for its unlawful conduct in participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate the supply of, rig bids for, and fix, stabilize, and maintain the prices of, certain automotive products sold to automobile manufacturers, including, Nissan Motor Company, Ltd., Honda Motor Company, Ltd., General Motors Company, Ford Motor Company, Toyota Motor Corporation, Chrysler Group LLC, and Fuji Heavy Industries Ltd., and certain of their subsidiaries, affiliates and suppliers, in the United States and elsewhere, from at least as early as January 2000 until at least February 2010.  For purposes of the plea agreement between Defendant Hitachi Automotive Systems, Ltd. and the United States, "automotive parts" were defined to include, starter motors, alternators, air flow meters, valve timing control devices, fuel injection systems, electronic

4

throttle bodies, ignition coils, inverters and motor generators.  The combination and conspiracy engaged in by Defendant Hitachi Automotive Systems, Ltd. and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

12.     On September 18, 2014, the DOJ announced that a federal grand jury returned a one-count Indictment against Takashi Toyokuni, Ken Funasaki, Kazunobu Tsunekawa and Tomiya Itakura of Hitachi Automotive Systems Ltd. for agreeing to allocate the supply of, rig bids for, and fix, stabilize and maintain the prices of, certain automotive parts sold to various automobile manufacturers such as, Ford Motor Company, General Motors LLC, Nissan Motor Co. Ltd., Toyota Motor Corporation, and Honda Motor Company, Ltd., and others, and certain of their subsidiaries, in the United States and elsewhere.  During the period covered by the Indictment, Takashi Toyokuni, Ken Funasaki, and Kazunobu Tsunekawa worked for Hitachi in the United States and Japan.  For purposes of the Indictment, "automotive parts" included starter motors, alternators, air flow meters, valve timing control devices, fuel injection systems, electronic throttle bodies, ignition coils, inverters and motor generators.

13.     On April 23, 2015, the DOJ announced that Takashi Toyokuni, a former executive of Defendant Hitachi Automotive Systems Ltd., agreed to serve fifteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Indictment charging him with participating in a conspiracy to agree upon bids and prices for, and allocate the supply of, starter motors, alternators, air flow meters, valve timing control devices, fuel injection systems, electronic throttle bodies, ignition coils, inverters and motor generators sold, in the United States and elsewhere.  From January 2000 to April 2008, Takashi Toyokuni was involved in the sale of and had responsibility over starter motors and alternators.

DM1\7333972.1

14.     According to the plea agreements of Defendant Hitachi Automotive Systems Ltd. and its former executive, conspiratorial meetings and discussions took place in the United States and elsewhere, and the automotive parts that were the subject of the conspiracy were sold to Nissan, Honda, GM, Ford, Toyota, and others, and certain of their subsidiaries, affiliates and suppliers in the U.S. and elsewhere, by Hitachi Automotive Systems Americas, Inc., which is located in the Eastern District of Michigan.

15.     Defendant Mitsuba Corporation agreed to plead guilty and to pay a criminal fine of $135 million for participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain automotive parts sold to automobile manufacturers, including Honda Motor Company, Ltd., Fuji Heavy Industries Ltd., Nissan Motor Company, Ltd., Toyota Motor Corporation, Chrysler Group LLC, and certain of their subsidiaries, affiliates and suppliers in the United States and elsewhere, from at least as early as January 2000 through at least February 2010.  "Automotive parts," for purposes of the plea agreement, included, among other parts, starter motors.  The combination and conspiracy engaged in by Defendant Mitsuba Corporation and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

16.     On December 1, 2014, the DOJ announced that a former executive of Defendant Mitsuba, Kazumi Umahashi, agreed to serve thirteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count Information charging him with conspiring to fix the prices of certain automotive parts installed in cars sold in the United States and elsewhere. According to the Information, Kazumi Umahashi participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for,

and to fix, stabilize, and maintain the prices of, certain automotive parts, including windshield wiper systems and starter motors sold to Honda Motor Company Ltd. and certain of its subsidiaries, affiliates, suppliers, and others in the United States and elsewhere.

17.    According to the plea agreements of Defendant Mitsuba and its former executive, conspiratorial meetings and discussions took place in the United States and elsewhere, and the automotive parts that were the subject of the conspiracy were sold to Honda, Nissan, Toyota, Chrysler and others, and certain of their subsidiaries, affiliates and suppliers located in the U.S. and elsewhere, by Defendant Mitsuba and its U.S. subsidiaries located in the Eastern District of Michigan and elsewhere.

18.    Defendant Mitsubishi Electric Corporation agreed to plead guilty and to pay a criminal fine of $190 million for participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the price of, certain automotive parts sold to automobile manufacturers, including Ford Motor Company, General Motors LLC, Chrysler Group LLC, Fuji Heavy Industries Ltd., Nissan Motor Company, Ltd., Honda Motor Company, Ltd., Toyota Motor Corporation, and certain of their subsidiaries, in the United States and elsewhere, from at least as early as January 2000 until at least February 2010. "Automotive parts," for purposes of the plea agreement, included, among other products, starter motors, alternators, and ignition coils. The combination and conspiracy engaged in by Defendant Mitsubishi Electric Corporation and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

19.    On September 18, 2014, the DOJ announced that a federal grand jury returned a three-count Indictment against Atsushi Ueda, Minoru Kurisaki, and Hideyuki Saito, current and

former executives of Mitsubishi Electric Corporation, for their participation in a conspiracy to fix the prices of certain automotive parts, including starter motors, alternators, and ignition coils. Count one charged Atsushi Ueda, Minoru Kurisaki, and Hideyuki Saito with participating in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate the supply of, rig bids for, and fix, stabilize, and maintain the prices of, various automotive parts sold to Ford Motor Company, General Motors LLC, Chrysler Group LLC, Fuji Heavy Industries Ltd., Nissan Motor Company Ltd., Honda Motor Company Ltd., and certain of their subsidiaries, in the United States and elsewhere.  Count two charged Minoru Kurisaki and Hideyuki Saito with knowingly conspiring to obstruct justice by destroying documents and corruptly persuading, and attempting to persuade others, to destroy documents related to an official proceeding, grand jury investigation, and U.S. agency investigation.  Count three charged Hideyuki Saito with knowingly and corruptly persuading, or attempting to persuade, other employees of Mitsubishi Electric Corporation to destroy or conceal paper documents and delete electronic data that may contain evidence of antitrust crimes in the United States and elsewhere with the intent to impair the objects' availability and integrity for use in an official proceeding.

20.     According to Defendant Mitsubishi's plea agreement, conspiratorial meetings and discussions took place in the United States and elsewhere, and the automotive parts that were the subject of the conspiracy were sold to Ford, GM, Chrysler, Subaru, Honda, Nissan, and others, and certain of their subsidiaries, by Defendant Mitsubishi's U.S. indirect subsidiary Mitsubishi Electric Automotive America, Inc., which is located in the Eastern District of Michigan.

21.     Defendant Robert Bosch GmbH agreed to plead guilty and to pay a criminal fine of $57.8 million for participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and

8

maintain the price of, automotive parts sold to automobile manufacturers, including

DaimlerChrysler AG, Ford Motor Company, General Motors Company, Andreas Stihl AG & Co.

and others, and certain of their subsidiaries, in the United States and elsewhere, from at least as

early as January 2000 until at least July 2011.  For purposes of the plea agreement, the term

"Automotive parts" included, starter motors, spark plugs, and oxygen sensors.  The combination

and conspiracy engaged in by Defendant Bosch and its co-conspirators was in unreasonable

restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act,

15 U.S.C. § 1.

22.     The Defendants and their co-conspirators participated in a combination and

conspiracy to suppress and eliminate competition in the vehicle parts industry by agreeing to

allocate the supply of, rig bids for, and fix, stabilize, and maintain the prices of Alternators and

Starters sold to vehicle manufacturers and others in the United States.  The combination and

conspiracy engaged in by the Defendants and their co-conspirators was in unreasonable restraint

of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15

U.S.C. § 1, and state antitrust, unfair competition, consumer protection and unjust enrichment

laws.

23.     As a direct result of the anti-competitive and unlawful conduct alleged herein,

Plaintiffs and the Classes paid artificially inflated prices for Alternators and Starters.  Plaintiffs

and the members of the Classes have thereby suffered antitrust injury to their business or

property.

## JURISDICTION AND VENUE

24.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to

secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman

DM1\7333972 1

Act (15 U.S.C. § 1).  Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition, consumer protection and unjust enrichment laws, and seek to obtain restitution, recover damages and secure other relief against the Defendants for violations of those state laws.  Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

25.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337.  This Court has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of a state different from the Defendants.

26.     This Court also has supplemental jurisdiction of the state law claims asserted herein pursuant to 28 U.S.C. § 1367 because they are so related to the claims asserted in this action over which the Court has original jurisdiction that they form part of the same case or controversy.

27.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

28.     This Court has *in personam* jurisdiction over the Defendants because each

Defendant, either directly or through the ownership and/or control of their subsidiaries, *inter*

*alia*:  (a) transacted business in the United States, including in this District; (b) directly or

indirectly sold or marketed substantial quantities of Alternators and Starters throughout the

United States, including in this District, that were specifically designed for vehicles that were

intended to be sold in the United States; (c) had substantial aggregate contacts with the United

States, including in this District, as a whole; or (d) was through its own actions and through the

actions of its co-conspirators, engaged in an illegal price-fixing conspiracy that was directed at,

and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to, the

business or property of persons and entities residing in, located in, or doing business throughout

the United States, including in this District; and/or (e) engaged in actions in furtherance of an

illegal conspiracy in this district either itself or through its co-conspirators.  The Defendants also

conduct business throughout the United States, including in this District, and have purposefully

availed themselves of the laws of the United States.

29.     Defendants engaged in conduct both inside and outside of the United States that

caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon

interstate commerce within the United States and upon import trade and commerce into the

United States.

30.     The activities of Defendants and their co-conspirators were within the flow of,

were intended to, and did have, a substantial effect on interstate commerce of the United States.

Defendants' products are sold in the flow of interstate commerce. In addition, Defendants

Hitachi, Mitsuba, MELCO, and Bosch each participated in conspiratorial meetings and

discussions located in the United States; each participated in price manipulation and market

allocation for vehicle parts installed in vehicles manufactured and sold solely in the United States; each coordinated their price fixing schemes and conspiratorial agreements with subsidiaries located in the United States; and each took further actions in furtherance of the conspiracy with employees and co-conspirators located in the United States.

31.     Alternators and Starters manufactured abroad by the Defendants and sold for use in Trucks and Equipment in the United States are goods brought into the United States for sale, and therefore constitute import commerce.  To the extent any Alternators and Starters were purchased in the United States, and such Alternators and Starters do not constitute import commerce, the Defendants' activities with respect thereto, as more fully alleged herein during the Class Period, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce.  The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury to Plaintiffs and the Classes in the United States.

32.     By reason of the unlawful activities hereinafter alleged, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes.  Defendants, directly and through their agents, engaged in activities affecting all 50 states, to fix or inflate prices of Alternators and Starters, and that conspiracy unreasonably restrained trade and adversely affected the market for Alternators and Starters, which conspiracy unreasonably restrained trade and adversely affected the market for Alternators and Starters.

33.     The Defendants' conspiracy and wrongdoing described herein adversely affected persons and businesses in the United States who purchased Alternators and Starters and Trucks and Equipment containing Alternators and Starters, including Plaintiffs and the Classes.

DM1\7333972 1

34.     Plaintiffs collectively purchased and/or sold Trucks containing Alternators and Starters in each of the 50 U.S. States.

## PARTIES

### Plaintiffs

35.     Plaintiff Rush AL is a Delaware corporation with its principal place of business in Alabama.  Rush AL is an authorized Peterbilt dealer.  During the Class Period Rush AL purchased, displayed, advertised, and sold Trucks and Equipment containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators Rush AL purchased and received Trucks and Equipment containing Alternators and Starters in Alabama and resold those Trucks and Equipment in Alabama and elsewhere.

36.     Plaintiff Rush AZ is a Delaware corporation with its principal place of business in Arizona. Rush AZ is an authorized Peterbilt and Hino dealer.  During the Class Period Rush AZ purchased, displayed, advertised, and sold Trucks and Equipment containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators.  Rush AZ purchased and received Trucks and Equipment containing Alternators and Starters in Arizona and resold those Trucks and Equipment in Arizona and elsewhere.

37.     Plaintiff Rush CA is a Delaware corporation with its principal place of business in California.  Rush CA is an authorized Peterbilt, Hino, Isuzu, and Ford dealer.  During the Class Period Rush CA purchased, displayed, advertised, and sold Trucks and Equipment containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators.  Rush CA purchased and received Trucks and Equipment containing Alternators and Starters in California and resold those Trucks and Equipment in California and elsewhere.

38.     Plaintiff Rush CO is a Delaware corporation with its principal place of business in Colorado.  Rush CO is an authorized Peterbilt, Isuzu, and Ford dealer.  During the Class Period Rush CO purchased, displayed, advertised, and sold Trucks and Equipment containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators. Rush CO purchased and received Trucks and Equipment containing Alternators and Starters in Colorado and resold those Trucks and Equipment in Colorado and elsewhere.

39.     Plaintiff Rush FL is a Delaware corporation with its principal place of business in Florida.  Rush FL is an authorized Peterbilt, Hino, and Isuzu dealer.  During the Class Period Rush FL purchased, advertised, displayed, and sold Trucks and Equipment containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators. Rush FL purchased and received Trucks and Equipment containing Alternators and Starters in Florida and resold those Trucks and Equipment in Florida and elsewhere.

40.     Plaintiff Rush GA is a Delaware corporation with its principal place of business in Georgia.  Rush GA is an authorized International, Hino, Isuzu, and IC Bus dealer.  During the Class Period Rush GA purchased, displayed, advertised, and sold Trucks and Equipment containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators.  Rush GA purchased and received Trucks and Equipment containing Alternators and Starters in Georgia and resold those Trucks and Equipment in Georgia and elsewhere.

41.     Plaintiff Rush ID is a Delaware corporation with its principal place of business in Idaho.  Rush ID is an authorized International, Autocar, and IC Bus dealer.  During the Class Period Rush ID purchased, displayed, advertised, and sold Trucks and Equipment containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators.

DM1\7333972 1

Rush ID purchased and received Trucks and Equipment containing Alternators and Starters in Idaho and resold those Trucks and Equipment in Idaho and elsewhere.

42.     Plaintiff Rush IL is a Delaware corporation with its principal place of business in Illinois.  Rush IL is an authorized International dealer.  During the Class Period Rush IL purchased, displayed, advertised, and sold Trucks and Equipment containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators.  Rush IL purchased and received Trucks and Equipment containing Alternators and Starters in Illinois and resold those Trucks and Equipment in Illinois and elsewhere.

43.     Plaintiff Rush IN is a Delaware corporation with its principal place of business in Indiana.  Rush IN is an authorized International dealer.  During the Class Period Rush IN purchased, displayed, advertised, and sold Trucks and Equipment containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators.  Rush IN purchased and received Trucks and Equipment containing Alternators and Starters in Indiana and resold those Trucks and Equipment in Indiana and elsewhere.

44.     Plaintiff Rush KS is a Delaware corporation with its principal place of business in Kansas.  Rush KS is an authorized Hino and Isuzu dealer.  During the Class Period Rush KS purchased, displayed, advertised, and sold Trucks and Equipment containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators.  Rush KS purchased and received Trucks and Equipment containing Alternators and Starters in Kansas and resold those Trucks and Equipment in Kansas and elsewhere.

45.     Plaintiff Rush MO is a Missouri corporation with its principal place of business in Missouri.  Rush MO is an authorized International dealer.  During the Class Period Rush MO purchased, displayed, advertised, and sold Trucks and Equipment containing Alternators and

Starters manufactured by one or more of the Defendants or their co-conspirators.  Rush MO purchased and received Trucks and Equipment containing Alternators and Starters in Missouri and resold those Trucks and Equipment in Missouri and elsewhere.

46.     Plaintiff Rush NV is a Delaware corporation with its principal place of business in Nevada.  Rush NV is an authorized Peterbilt and Ford dealer.  During the Class Period Rush NV purchased, displayed, advertised, and sold Trucks and Equipment containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators.  Rush NV purchased and received Trucks and Equipment containing Alternators and Starters in Nevada and resold those Trucks and Equipment in Nevada and elsewhere.

47.     Plaintiff Rush NM is a Delaware corporation with its principal place of business in New Mexico.  Rush NM is an authorized Peterbilt dealer.  During the Class Period Rush NM purchased, displayed, advertised, and sold Trucks and Equipment containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators.  Rush NM purchased and received Trucks and Equipment containing Alternators and Starters in New Mexico and resold those Trucks and Equipment in New Mexico and elsewhere.

48.     Plaintiff Rush NC is a Delaware corporation with its principal place of business in North Carolina.  Rush NC is an authorized International, Peterbilt, Hino, and Isuzu dealer.  During the Class Period Rush NC purchased, displayed, advertised, and sold Trucks and Equipment containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators.  Rush NC purchased and received Trucks and Equipment containing Alternators and Starters in North Carolina and resold those Trucks and Equipment in North Carolina and elsewhere.

49.     Plaintiff Rush OH is a Delaware corporation with its principal place of business in Ohio.  Rush OH is an authorized International, IC Bus, Isuzu, Ford, and Mitsubishi dealer During the Class Period Rush OH purchased, displayed, advertised, and sold Trucks and Equipment containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators.  Rush OH purchased and received Trucks and Equipment containing Alternators and Starters in Ohio and resold those Trucks and Equipment in Ohio and elsewhere.

50.     Plaintiff Rush OK is a Delaware corporation with its principal place of business in Oklahoma.  Rush OK is an authorized Peterbilt, Hino, Isuzu, and Ford dealer.  During the Class Period Rush OK purchased, displayed, advertised, and sold Trucks and Equipment containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators. Rush OK purchased and received Trucks and Equipment containing Alternators and Starters in Oklahoma and resold those Trucks and Equipment in Oklahoma and elsewhere.

51.     Plaintiff Rush OR is a Delaware corporation with its principal place of business in Oregon.  Rush OR is an authorized International dealer.  During the Class Period Rush OR purchased, displayed, advertised, and sold Trucks and Equipment containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators.  Rush OR purchased and received Trucks and Equipment containing Alternators and Starters in Oregon and resold those Trucks and Equipment in Oregon and elsewhere.

52.     Plaintiff Rush TN is a Delaware corporation with its principal place of business in Tennessee.  Rush TN is an authorized Peterbilt dealer.  During the Class Period Rush TN purchased, displayed, advertised and sold Trucks and Equipment containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators.  Rush TN

DM1\7333972 1

purchased and received Trucks and Equipment containing Alternators and Starters in Tennessee and resold those Trucks and Equipment in Tennessee and elsewhere.

53. Plaintiff Rush TX is a Texas limited partnership with its principal place of business in Texas. Rush TX is an authorized Peterbilt, Hino, Isuzu, Blue Bird, Micro Bird, Elkhart, and Ford dealer. During the Class Period Rush TX purchased, displayed, advertised, and sold Trucks and Equipment containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators. Rush TX purchased and received Trucks and Equipment containing Alternators and Starters in Texas and resold those Trucks and Equipment in Texas and elsewhere.

54. Plaintiff Rush UT is a Delaware corporation with its principal place of business in Utah. Rush UT is an authorized International, IC Bus, Autocar, and Mitsubishi Fuso dealer. During the Class Period Rush UT purchased, displayed, advertised, and sold Trucks and Equipment containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators. Rush UT purchased and received Trucks and Equipment containing Alternators and Starters in Utah and resold those Trucks and Equipment in Utah and elsewhere.

55. Plaintiff Rush VA is a Delaware corporation with its principal place of business in Virginia. Rush VA is an authorized International dealer. During the Class Period Rush VA purchased, displayed, advertised, and sold Trucks and Equipment containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators. Rush VA purchased and received Trucks and Equipment containing Alternators and Starters in Virginia and resold those Trucks and Equipment in Virginia and elsewhere.

18

**Defendants**

**Hitachi Defendants**

56.     Defendant Hitachi, Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan.  Hitachi Ltd.—directly and/or through subsidiaries that it wholly owned and/or controlled—manufactured, marketed, and/or sold Alternators and Starters for use in Trucks and/or Equipment that were purchased throughout the United States, including in this district, during the Class Period.

57.     Defendant Hitachi Automotive Systems, Ltd. (collectively with Hitachi Ltd., "Hitachi") is a Japanese corporation with its principal place of business in Tokyo, Japan.  Hitachi Automotive Systems, Ltd. is a subsidiary of and wholly owned and/or controlled by its parent, Hitachi, Ltd.  Hitachi Automotive Systems, Ltd. manufactured, marketed, and/or sold Alternators and Starters for use in Trucks and/or Equipment that were purchased throughout the United States, including in this district, during the Class Period.

**Mitsubishi Defendants**

58.     Defendant Mitsubishi Electric Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan.  Mitsubishi Electric Corporation—directly and/or through subsidiaries that it wholly owned and/or controlled—manufactured, marketed, and/or sold Alternators and Starters for use in Trucks and Equipment that were purchased throughout the United States, including in this district, during the Class Period.  In addition to selling electronic control units used in vehicle wire harness systems, Mitsubishi Electric Corporation also sells Alternators and Starters for use in Trucks and Equipment. Mitsubishi Electric Corporation identifies Truck and Equipment original equipment manufacturers ("OEMs") Peterbilt, Kenworth, Mack Trucks, Volvo Trucks, Freightliner, International Trucks, and Prevost as its customers in its sales materials.

19

59.     Defendant Mitsubishi Electric US Holdings, Inc. is a Delaware corporation with its principal place of business in Cypress, California.  It is a subsidiary of and wholly owned and/or controlled by its parent, Mitsubishi Electric Corporation.  Defendant Mitsubishi Electric US Holdings, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Alternators and Starters for use in Trucks and Equipment that were sold and purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

60.     Defendant Mitsubishi Electric Automotive America, Inc. (collectively with Mitsubishi Electric Corporation, and Mitsubishi Electric US Holdings, Inc., "MELCO") is a Delaware corporation with its principal place of business in Mason, Ohio.  It is a subsidiary of and wholly owned and/or controlled by its parent, Mitsubishi Electric US Holdings.  Defendant Mitsubishi Electric Automotive America, Inc. manufactured, marketed and/or sold Alternators and Starters for use in Trucks and Equipment that were sold and purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its United States or Japanese parents.

**<u>Mitsuba Defendants</u>**

61.     Defendant Mitsuba Corporation is a Japanese company with its principal place of business in Gunma, Japan.  Mitsuba Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Alternators and Starters for use in Trucks and Equipment  that were sold and purchased throughout the United States, including in this District, during the Class Period.

DM1\7333972 1

62.     Defendant American Mitsuba Corporation (collectively with Mitsuba Corporation, "Mitsuba") is an Illinois corporation with its principal place of business in Novi, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its parent, Mitsuba Corporation.  American Mitsuba Corporation manufactured, marketed and/or sold Alternators and Starters for use in Trucks and Equipment that were sold and purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

**Bosch Defendants**

63.     Defendant Robert Bosch GmbH is a German company with its headquarters in Stuttgart, Germany.  Robert Bosch GmbH – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Starters for use in Trucks and Equipment that were sold and purchased throughout the United States, including in this District, during the Class Period.

64.     Defendant Robert Bosch LLC (collectively with Robert Bosch GmbH, "Bosch") is a Delaware company with its principal place of business in Farmington Hills, Michigan.  It is an affiliate of and wholly controlled by Bosch Electrical Drives Co., Ltd. Robert Bosch LLC – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Starters for use in Trucks and Equipment that were sold and purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Korean affiliate.

65.     Bosch manufactures Alternators designed specifically for use in Trucks and Equipment.  These include Bosch's "Long Haul Extreme Alternators," "Long Haul Alternators," Alternators for use in refrigeration units, Alternators for use in school buses, "Universal Alternators" which are marketed for "many popular heavy duty truck, agricultural and industrial applications," and "Long Haul High Output Alternators," which are designed to have increased output and charge rate.

66.     Bosch also manufactures Starters designed specifically for use in Trucks and Equipment.  These include "Long Haul Commercial Starters" and "Long Haul Starters".

## AGENTS AND CO-CONSPIRATORS

67.     When Plaintiffs refer to a corporate family or companies by a single name in the Complaint, they are alleging that one or more employees or agents of entities within that corporate family engaged in conspiratorial acts on behalf of every company in that family.  The individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of their respective corporate families. As a result, those agents represented the entire corporate family with respect to such conduct, and the corporate family was party to the agreements that those agents reached.

68.     Each Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged.

69.     Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as Defendants in this lawsuit, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this

Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

70.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

## FACTUAL ALLEGATIONS

### A.  The Alternators and Starters Industry

71.     "Alternators" are devices that charge a vehicle's battery and power the electrical system of a vehicle when its engine is running.  If the alternator is not working properly, the battery will eventually lose its charge and all electrical systems in the vehicle will stop working; this includes starting the vehicle.  See Figure 1.



Figure 1.

72.     "Starters" and "Starter Motors" are devices that power a vehicle's battery to "turn over" and start when the driver turns the ignition switch.  When a Starter is damaged, a vehicle will not turn on.  See Figure 2.

23



Figure 2.

73.     Alternators and Starters are part of the vehicle's starting and charging system. The starting system includes the battery, starter, solenoid, ignition switch, and in some cases, a starter relay.  A typical charging system contains an alternator, drive belt, battery, voltage regulator and the associated wiring.  The charging system, like the starting system is a series circuit with the battery wired in parallel.  After the engine is started and running, the alternator takes over as the source of power and the battery becomes part of the load on the charging system.  See Figure 3.



Figure 3.

74.     In 2011, the U.S. OEM market for Alternators and Starters was $243 million. From January 2000 to April 2008, Hitachi Automotive's sales of Starters to GM and Nissan; together with sales of Alternators to Nissan in the United States and elsewhere totaled more than $100 million.

75.     Alternators and Starters are installed by Truck and Equipment OEMs in Trucks and Equipment as part of the manufacturing process.

76.     Many automobile OEMs including Ford, General Motors, Isuzu, Fuji Heavy Industries, Nissan, Subaru, Honda, and Chrysler manufacture and sell Trucks and/or Equipment. Other automobile OEMs, including Toyota, Daimler, and Mitsubishi, sell Trucks and Equipment through subsidiaries or other affiliated companies. For example, Toyota is the majority owner of Hino Motors ("Hino"). Hino represents the Toyota Group in the market for medium-duty trucks, heavy-duty trucks, and buses. Daimler owns approximately ninety percent (90%) of Mitsubishi Fuso Truck and Bus Corp. ("Fuso"). Mitsubishi also owns and has owned an interest in Fuso throughout the Class Period. Fuso represents the Daimler Group in the market for medium-duty trucks.

77.     Truck and Equipment OEMs, many of which are large manufacturers such as Autocar, Daimler, Ford, Fuso, Hino, International, Isuzu, Kenworth, Mack, Peterbilt, Volvo and others, purchased Alternators and Starters directly from Defendants during the conspiracy period.

78.     When purchasing Alternators and Starters, Truck and Equipment OEMs issue Requests for Quotation ("RFQs") to Vehicle parts suppliers on a model-by-model basis for model-specific parts. Alternators and Starters are not commodity items. Vehicle parts suppliers submit quotations, or bids, to OEMs in response to RFQs, and the OEMs usually award the

25

business to the selected parts supplier for the lifespan of the model.  Truck and Equipment OEMs procure Alternators and Starters and other parts for U.S.-manufactured vehicles in Japan and the United States.

79.     Upon information and belief, for Alternators and Starters, OEMs will often request price quotations for both parts within the same RFQ.  As a result, parts suppliers typically use the same sales team for Alternators and Starters when working with the OEMs.

80.     Each of the Defendants and their co-conspirators supplied Alternators and Starters to Truck and Equipment OEMs for installation in Trucks and Equipment manufactured and sold in the United States and elsewhere.  The Defendants and their co-conspirators manufactured Alternators and Starters (a) in the United States (including in all the states having laws permitting recovery of damages by indirect purchasers, as listed *infra*), for installation in Trucks and Equipment manufactured and sold in the United States (including in all the states having laws permitting recovery of damages by indirect purchasers, as listed *infra*), (b) in Japan for export to the United States (including in all the states having laws permitting recovery of damages by indirect purchasers, as listed *infra*) and installation in Trucks and Equipment manufactured and sold in the United States (including in all the states having laws permitting recovery of damages by indirect purchasers, as listed *infra*), and (c) in Japan, and possibly other countries, for installation in Trucks and Equipment manufactured in Japan, and possibly other countries, for export to and sale in the United States (including in all the states having laws permitting recovery of damages by indirect purchasers, as listed *infra*).

81.     As described below, Defendants engaged in numerous acts of conspiratorial conduct intended to and having the effect of decreasing competition and increasing prices for Alternators and Starters used in Trucks and Equipment.  This conspiratorial conduct was part of

the same pattern and practice of conspiratorial conduct as the Defendants' illegal conduct with respect to Alternators and Starters for use in automobiles and other passenger vehicles.

82.    Upon information and belief, Defendants' employees responsible for negotiating the prices and terms for parts, including Alternators and Starters, were involved in sales to Truck and Equipment manufacturers as well as to automobile manufacturers.

83.    Alternators and Starters manufactured, distributed, and sold for installation in Trucks and Equipment by Defendants during the Class Period serve the same basic function as Alternators and Starters manufactured, distributed, and sold for installation in automobiles, but are typically of a heavier duty construction.

84.    Defendants comprise a majority of parts suppliers who manufacture Alternators and Starters for sale to Truck and Equipment OEMs.

85.    Plaintiffs and members of the proposed Classes indirectly purchased Alternators and Starters from one or more of the Defendants through their purchase of new Trucks and Equipment containing Alternators and Starters.

**B.  <u>The Structure and Characteristics of the Alternators and Starters Market Render the Conspiracy More Plausible</u>**

86.    The structure and other characteristics of the Alternators and Starters market in the United States is conducive to a price-fixing agreement and has made collusion particularly attractive in this market.  Specifically, the Alternators and Starters market:  (1) has high barriers to entry; (2) has inelasticity of demand; and, (3) has high market concentration.

**1.    The Alternators and Starters Market Has High Barriers to Entry**

87.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing.  Where, however, there are significant barriers to entry, new entrants are

less likely to enter the market.  Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

88.     Substantial barriers preclude, reduce, or make more difficult entry into the Alternators and Starters market.  A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, skilled labor, and long-standing customer relationships.

89.     The Defendants own several patents related to the manufacture of Alternators and Starters.  For example, the Hitachi Defendants own at least two patents related to the manufacture of alternators for motor vehicles, and own at least two patents related to the manufacture of starters used in motor vehicles.  These patents place a significant and costly burden on potential new entrants, who must avoid infringing on the patents when entering the market with a new product.

90.     Within Alternators and Starters, there is a significant amount of technology and engineering expertise required to build systems that fully comply with environmental and public health requirements and other regulatory standards including fuel economy requirements.

91.     In addition, OEMs cannot randomly change Alternators and Starters suppliers after they choose one because the OEMs design the features of Trucks and Equipment so that the Alternators and Starters it purchases for a vehicle are then integrated with the other components of the starting and charging systems of the particular vehicle model.  Thus, Alternators and Starters manufacturers and OEMs must agree on a design that is unique to a particular vehicle model.  It would be difficult for a new market entrant to do so.

**2.     There is Inelasticity of Demand for Alternators and Starters**

28

92.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any.  In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

93.     For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether.  Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

94.     Demand for Alternators and Starters is highly inelastic.  Demand for Alternators and Starters is inelastic because there are no close substitutes for these products.  In addition, customers must purchase Alternators and Starters as essential parts of a vehicle, even if the prices are kept at a supra-competitive level.  Anyone wanting to purchase a vehicle simply has no choice but to purchase Alternators and Starters.

### 3.     The Market for Alternators and Starters is Highly Concentrated

95.     A highly concentrated market is more susceptible to collusion and other anticompetitive practices.  Only a handful of manufacturers supply Alternators for installation in Vehicles sold in the U.S. and the market is concentrated. According to a leading industry report, the top four (4) suppliers of Alternators controlled approximately 70 percent of the global market in 2010.

DM1\7333972 1

96.     There is also a high level of concentration among firms in the Starters market. According to a leading industry report, the top four suppliers of Starters controlled approximately 76 percent of the global market in 2010.

### C.  Specific Conduct by Defendants

97.     ███████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████

98.     ███████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████

99.     ███████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████

100.    ███████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████

101.    ███████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████

DM1\7333972 1

102. █████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

103. █████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████

104. █████████████████████████████████████

██████████████████████████████████████████

██████████████████████

105. █████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

106. █████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

31

107. 

108.

109.

110.

111.

DM1\7333972 1

██████████████████████████████████████████████████████

████████████████████████████████████

112. ████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████

113. ██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████

114. ████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████

115. ████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████

116. ████████████████████████████████████████████████

██████████████████████████████████████████████████

████████

117.    Until 2012, Bosch was a significant shareholder of DENSO.

118. 

119.

120.

### D. **Global Government Investigations**

121.     A globally coordinated antitrust investigation is taking place in the United States, Europe, and Japan, aimed at suppliers of vehicle parts, including Alternators and Starters. The Department of Justice ("DOJ") has confirmed that its vehicle parts investigation is the largest criminal investigation that the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the illegal conduct. Almost $1 billion in criminal fines have already been levied against various vehicle parts manufacturers.

122.     A Japan Fair Trade Commission ("JFTC") official told a leading legal publication that the international automotive parts investigation would continue to widen because the automotive industry as a whole comprises many sub-industries. He characterized the investigation being conducted by the international antitrust authorities as "large and broad," and he declined to deny that this "would be history's largest case."

123.     The probe originated in Europe as the result of several European Original Equipment Manufacturers ("OEMs") coming together to bring a complaint to the European Commission Competition Authority ("EC"). The EC and the Federal Bureau of Investigation ("FBI") have executed surprise raids at the European and U.S. offices of several automotive parts

DM1\7333972 1

manufacturers, including certain Defendants, as part of an investigation into anticompetitive conduct related to the manufacturing and sale of automotive parts.

124.    On February 8, 2010, the EC executed surprise raids at the European offices of certain parts makers.  The DOJ has confirmed that its automotive parts investigation is the largest criminal investigation that the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the illegal conduct.  The DOJ has levied more than $2.5 billion in criminal fines against various parts manufacturers.

125.    The Japanese Fair Trade Commission ("JFTC") raided offices of Defendants as part of the spreading investigation into suspected price fixing on automotive parts.  According to its 2011 Annual Report, Mitsubishi has been subject to investigations conducted by the JFTC since July 2011.

126.    The JFTC probe has found that some of the vehicle parts manufacturers had split into varying groups for the differing purchasers and the different parts.  The investigation also found that Defendants restrained competition by designating certain Defendants to win bids on particular automotive parts, including Alternators and Starters.  The investigation concluded that Defendants' scheme was successful because the designated Defendants won bids that Defendants had intended them to win.

127.    The companies rigged the bidding process for supply contracts with motor vehicle OEMs for vehicle parts, including Alternators and Starters, by pre-ordaining the winners and losers.  The JFTC explained that these companies "substantially restrained competition in the fields of each product ordered by each automobile company, by designating successful bidders and managing to have the designated successful bidders win the biddings, respectively."

128.    The DOJ has stated that it is conducting an investigation of potential antitrust activity and coordinating its investigation with antitrust regulators in Europe.

129.    Indeed, on February 23, 2010, around the same time as the raids by the Japanese and European competition authorities, investigators from the FBI raided three Detroit-area Japanese parts makers as part of a federal antitrust investigation.  The FBI executed warrants and searched the offices of these companies.  Special Agent Sandra Berchtold said the affidavits supporting issuance of the warrants were sealed in federal court.

130.    To obtain search warrants, the United States was legally required to have probable cause, accepted by a magistrate, to believe that it would obtain evidence of an antitrust violation as a result of executing the search warrant – that is, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a seemingly lawful business would uncover evidence of antitrust violations and that claimed evidence must have been examined and accepted by a magistrate.  That belief, which was recounted in sworn affidavits or testimony, must be grounded on reasonably trustworthy information.

**E.  Guilty Pleas**

**1.    Plea Agreement of Hitachi Automotive Systems Ltd.**

2.    On September 26, 2013, the DOJ announced that Defendant Hitachi Automotive Systems, Ltd. agreed to pay a $195 million criminal fine and to plead guilty to a one-count criminal Information charging it with participating in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of certain automotive parts sold to Nissan Motor Company, Ltd., Honda Motor Company, Ltd., General Motors LLC, Ford Motor Company, Toyota Motor Corporation, Chrysler Group, LLC, Fuji Heavy Industries, Ltd., and certain of their subsidiaries and certain of its subsidiaries in the United States and elsewhere from at least as early as January

36

2000 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1. For purposes of Hitachi's plea agreement, "automotive parts" is defined to include, among other automotive parts, starter motors and alternators.

3.      According to the Information filed, Defendant Hitachi Automotive Systems, Ltd. and its co-conspirators carried out the Alternators and Starters conspiracy by:

(a)     participating in meetings, conversations, and communications in the United States and elsewhere to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(b)     agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(c)     agreeing, during those meetings, conversations, and communications, to allocate the supply of automotive parts sold to automobile manufactures in the United States and elsewhere;

(d)     agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

(e)     submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f)     selling automotive parts to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)     accepting payment for automotive parts sold to automobile manufacturers in the United State and elsewhere at collusive and noncompetitive prices;

(h)     engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

(i)     employing measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations.

### 4.     Plea Agreement of Mitsubishi Electric Corporation

131.    On September 26, 2013, the DOJ announced that Defendant MELCO had agreed to plead guilty and to pay a $190 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize, and maintain prices of numerous motor vehicle parts sold to automobile manufacturers in the United States and elsewhere.

132.    In its plea agreement, Mitsubishi Electric Corporation admitted to participating "in a conspiracy among major automotive parts manufacturers, the primary purpose of which was to rig bids for, and to fix, stabilize and maintain the prices of, certain automotive parts sold to Ford Motor Company, General Motors LLC, Chrysler Group LLC, Fuji Heavy Industries Ltd., Nissan Motor Company Ltd., Honda Motor Company Ltd., Toyota Motor Corporation and certain of their subsidiaries in the United States and elsewhere" from at least as early as January 2000 until at least February 2010. Mitsubishi Electric Corporation's guilty plea defines automotive parts to include, among other products, automobile starter motors.

133.    Mitsubishi Electric Corporation's guilty plea further requires Mitsubishi Electric Corporation and its subsidiaries to provide the DOJ with cooperation in its investigation of automotive parts, including with respect to starter motors.  In return for the cooperation of

38

Mitsubishi Electric Corporation and its subsidiaries , the guilty plea provides that the DOJ will refrain from criminally prosecuting Mitsubishi Electric Corporation and its subsidiaries for their participation in the conspiracy to rig bids for, and to fix, stabilize and maintain the prices of vehicle parts, including starter motors.

134.    Mitsubishi Electric Corporation admitted in its guilty plea that upon learning of the criminal investigation into the vehicle parts industry in February 2010, Mitsubishi Electric Corporation employees "took steps to destroy evidence of their criminal activity for fear of its discovery by law enforcement."

135.    According to the Information filed, Defendant Mitsubishi Electric Corporation and its co-conspirators carried out the automotive parts combination and conspiracy by, among other things, the following:

(a) participating in meetings, conversations, and communications in the United States and elsewhere to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(b) agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(c) agreeing, during those meetings, conversations, and communications, to allocate the supply of certain automotive parts sold to automobile manufacturers in the United States and elsewhere;

(d) agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

39

(e) submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f) selling certain automotive parts to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g) accepting payment for certain automotive parts sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(h) engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme;

(i) measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations.

### 5.     Plea Agreement of Mitsuba

136.     On September 26, 2013, the DOJ announced that Defendant Mitsuba Corporation agreed to pay a $135 million criminal fine and plead guilty to a two-count Information charging it with:  (i) participating in a combination and conspiracy to suppress and eliminate competition in automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain automotive parts sold to automobile manufacturers, including Honda Motor Company Ltd., Fuji Heavy Industries Ltd., Nissan Motor Company Ltd., Toyota Motor Corporation, Chrysler Group, LLC, and certain of their subsidiaries in the United States and elsewhere, from at least as early as January 2000 through at least February 2010, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1; and (ii) altering, destroying, mutilating, concealing, covering up, falsifying and making false entries in documents and tangible objects with the intent

to impede, obstruct, and influence the investigation of the conduct charged in the other count, and in relation to and contemplation of such investigation, in violation of 18 U.S.C. § 1519.  For purposes of Mitsuba's plea agreement, "automotive parts" are defined to include, among other automotive parts, starter motors.

137.    According to the Information filed, Defendant Mitsuba Corporation and its co-conspirators carried out the automotive parts combination and conspiracy by, among other things, the following:

> (a) participating in meetings, conversations, and communications in the United States and elsewhere to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

> (b) agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

> (c) agreeing, during those meetings, conversations, and communications, to allocate the supply of certain automotive parts sold to automobile manufacturers in the United States and elsewhere;

> (d) agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

> (e) submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

DM1\7333972 1

(f) selling certain automotive parts to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g) accepting payment for certain automotive parts sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(h) engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme;

(i) employing measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations.

138.   With respect to the obstruction of justice count, the Mitsuba Information charged as follows:

> In or about February 2010, Executive A, acting on Defendant's behalf, knowingly altered, destroyed, mutilated, concealed, covered up, falsified and made false entries in records, documents and tangible objects with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States, to wit, an investigation by the FBI and the United States Department of Justice of possible violations of U.S. antitrust law, in relation to and contemplation of such matter and case, and furthermore did order and command other employees of the Defendant to do so, in violation of 18 U.S.C. § 1519.

> After becoming aware of the FBI search of Defendant's co-conspirator's U.S. offices, Executive A informed certain of his subordinates employed at the U.S. subsidiary of Defendant about the FBI search, and instructed such subordinates, as well as other employees of Defendant, to locate, conceal and destroy documents and electronic files that were likely to contain evidence of antitrust crimes in the United States and elsewhere.

> Executive A concealed and destroyed documents and electronic files in his possession, custody and control in the Eastern District of Michigan that were likely to contain evidence of antitrust crimes in the United States and elsewhere. Certain of Executive A's subordinates and other employees of Defendant took acts in the

42

Eastern District of Michigan and elsewhere to endeavor to conceal and destroy such documents and electronic files in the possession, custody and control of Defendant, and did conceal and destroy such documents and electronic files.

**6. Plea Agreement of Bosch**

139.   On March 31, 2015, the DOJ announced that Defendant Robert Bosch GmbH agreed to pay a $57.8 million criminal fine and plead guilty to a one-count criminal Information charging it with participating in a conspiracy to suppress and eliminate competition by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of certain automotive parts sold to DaimlerChrysler AG, Ford Motor Company, General Motors Company, Andreas Stihl AG & Co. and others, and certain of their subsidiaries in the United States and elsewhere, from at least as early as January 2000 until at least July 2011 in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.  For purposes of Bosch's plea agreement, "automotive parts" are defined to include, among other pats, starter motors.

140.   According to the Information filed, Defendant Robert Bosch GmbH and its co-conspirators carried out the automotive parts conspiracy by:

(a)  participating in meetings, conversations, and communications in the United States and elsewhere to discuss the bids and price quotations to be submitted to automobile and internal combustion engine manufacturers in the United States and elsewhere;

(b)  agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile and internal combustion engine manufacturers in the United States and elsewhere;

43

(c) agreeing, during those meetings, conversations, and communications, to allocate the supply of certain automotive parts sold to automobile and internal combustion engine manufacturers in the United States and elsewhere;

(d) agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile and internal combustion engine manufacturers in the United States and elsewhere;

(e) submitting bids, price quotations, and price adjustments to automobile and internal combustion engine manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f) selling certain automotive parts to automobile and internal combustion engine manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g) accepting payment for certain automotive parts sold to automobile and internal combustion engine manufacturers in the United States and elsewhere at collusive and noncompetitive prices; and

(h) engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme.

**F. Additional Criminal Pleas Related to Conspiracies in the Vehicle Parts Industry**

141. A significant number of motor vehicle parts suppliers have pled guilty to fixing the prices of various vehicle parts (including starter motors; alternators, wire harnesses; instrument panel clusters; fuel senders; heater control panels; occupant safety restraint systems; bearings; windshield wipers; radiators; steering angle sensors; anti-vibration rubber parts; air conditioning systems; automatic transmission fluid warmers; fan motors; and automotive lamps).

44

Along with those already mentioned in this Complaint, such companies include the following: TRW Deutschland Holding GmbH; Autoliv, Inc.; Nippon Seiki Co., Ltd.; JTEKT Corporation; Mitsuba Corporation; Mitsubishi Heavy Industries, Ltd.; NSK Ltd.; Panasonic Corporation; T. RAD Co., Ltd.; Tokai Rika Co.; Valeo Japan Co., Ltd.; and Yamashita Rubber Co., Ltd, among others.  The majority of the violators pled guilty to engaging in bid-rigging, price-fixing, and market allocation during the same time period as the Defendants with multiple motor vehicle OEMs as their targets.

142.    On September 29, 2011, the DOJ announced that Furukawa Electric had agreed to plead guilty and to pay a $200 million fine for its role in a criminal price-fixing and bid-rigging conspiracy involving the sale of vehicle wire harness systems to vehicle manufacturers.  Three Furukawa executives, who are Japanese nationals, also agreed to plead guilty and to serve prison time in the United States.

143.    On January 30, 2012, Yazaki Corporation and four of its executives, Tsuneaki Hanamura, Ryoji Kawai, Shigeru Ogawa, and Hisamitsu Takada, agreed to plead guilty to conspiring to rig bids, fix prices and allocate customers for vehicle wire harness systems from January 2000 until at least February 2010.

144.    On April 3, 2012, G.S. Electech Inc. agreed to plead guilty to "participat[ing] in a combination and conspiracy to suppress and eliminate competition in the automotive industry by agreeing to rig bids for, and to fix stabilize, and maintain the prices of, speed sensor wire assemblies sold to an automobile manufacturer in the United States and elsewhere."

145.    On April 23, 2012, Fujikura, Inc. agreed to plead guilty to participating in the conspiracy to fix prices, rig bids and allocate supply with regard to vehicle wire harness systems, between January 2006 and February 2010.

146.    On June 6, 2012, the DOJ announced that Autoliv Inc. had agreed to plead guilty and to pay a $14.5 million criminal fine for its role in a conspiracy to fix prices of seatbelts, airbags and steering wheels installed in United States vehicles to manufacturers.  The DOJ press release explained that Autoliv and its co-conspirators met in secret and agreed to allocate the supply of various automotive parts.  According to the Autoliv information, Autoliv and its coconspirators participated in meetings, conversations and communications to discuss and agree on the bids and price quotations to be submitted to certain manufacturers for occupant safety restraint systems, and agreed, during meetings, conversations and communications, to allocate the supply of occupant safety restraint systems sold to certain manufacturers on a model-by-model basis

147.    On July 30, 2012, the DOJ announced that TRW Deutschland Holding GmbH had agreed to plead guilty and to pay a $5.1 million criminal fine for its involvement in a conspiracy to fix prices of seatbelts, airbags and steering wheels installed in vehicles sold in the United States.

148.    On August 28, 2012, the DOJ announced that Nippon Seiki Co. Ltd. had agreed to plead guilty and to pay a $1 million criminal fine for its role in a conspiracy to fix prices of instrument panel clusters installed in vehicles sold in the United States and elsewhere.

149.    On October 30, 2012, the DOJ announced that Tokai Rika Co. Ltd. had agreed to plead guilty and to pay a $17.7 million criminal fine for its role in a conspiracy to fix prices of heater control panels sold to Toyota and installed in vehicles sold in the United States and elsewhere.  Tokai Rika also agreed to plead guilty to a charge of obstruction of justice related to the investigation of the antitrust violation.  In its plea agreement, Tokai Rika admitted that after it

learned of the FBI's investigation of its U.S. subsidiary, an executive directed Tokai Rika employees to delete electronic data and destroy incriminating paper documents.

150.     On February 15, 2013, Scott Hammond, the Deputy Assistant Attorney General in the Antitrust Division, discussed the DOJ's ongoing vehicle parts investigation in a Thomson Reuters article.  He said, "The investigation is broader than what we've announced so far…[The investigation] is still very much ongoing, but it already appears to be the biggest criminal antitrust investigation that we've ever encountered*.  I say the biggest with respect to the impact on U.S. businesses and consumers, and the number of companies and executives that are subject to the investigation*." (emphasis added).

151.     On July 16, 2013, the DOJ announced that Diamond Electric Mfg. Co. Ltd. had agreed to plead guilty and to pay a $19 million criminal fine for its role in a conspiracy to fix prices of ignition coils sold to Ford Motor Co., Toyota Motor Corp., Fuji Heavy Industries Ltd. and certain of their subsidiaries and installed in vehicles sold in the United States and elsewhere.

152.     In the press release announcing the fine against Diamond Electric Mfg. Co. Ltd., Robert D. Foley III, Agent in Charge, FBI Detroit Division said, "Those who engage in price fixing, bid rigging and other fraudulent schemes harm the automotive industry by driving up costs for vehicle makers and buyers."

153.     On July 18, 2013, Panasonic Corporation agreed to plead guilty and to pay a $45.8 million criminal fine for its role in a conspiracy to fix prices of switches, steering angle sensors and vehicle High Intensity Discharge (HID) ballasts sold to Toyota Motor Corp., Toyota Motor Engineering & Manufacturing North America Inc., Honda Motor Co. Ltd., American Honda Motor Co., Inc., Mazda Motor Corp., Mazda Motor of America Inc., Nissan Motor Co.

Ltd., and Nissan North America Inc. and installed in vehicles sold in the United States and elsewhere.

154.    On September 26, 2013, nine (9) additional Japanese motor vehicle suppliers agreed to plead guilty to conspiracy charges and pay more than $740 million in criminal fines for their roles in rigging the prices of more than thirty (30) different products sold to Chrysler, Ford, and General Motors, as well as to the U.S. subsidiaries of Honda, Mazda, Mitsubishi, Nissan, Toyota, and Fuji Heavy Industries:

(a)    Hitachi Automotive Systems Ltd. agreed to plead guilty and to pay a $195 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of motor vehicle parts including starter motors, alternators, air flow meters, valve timing control devices, fuel injection systems, electronic throttle bodies, ignition coils, inverters and motor generators sold to motor vehicle manufacturers in the United States and elsewhere;

(b)    Mitsuba Corporation agreed to plead guilty and to pay a $135 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of motor vehicle parts including fan motors, windshield washer systems and components, windshield wiper systems and components, starter motors, and power window motors sold to motor vehicle manufacturers in the United States and elsewhere.  Mitsuba Corporation also agreed to plead guilty to one (1) count of obstruction of justice, because of the company's efforts to destroy evidence ordered by a high-level U.S.-based executive after learning of the U.S. investigation of collusion in the parts industry;

(c)    Mitsubishi agreed to plead guilty and to pay a $190 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of

48

numerous motor vehicle parts sold to motor vehicle manufacturers in the United States and elsewhere;

(d)     Mitsubishi Heavy Industries Ltd. agreed to plead guilty and to pay a $14.5 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of compressors and condensers sold to motor vehicle manufacturers in the United States and elsewhere;

(e)     T.RAD Co. Ltd. agreed to plead guilty and to pay a $13.75 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of radiators and Automatic Transmission Fluid warmers (ATF warmers) sold to motor vehicle manufacturers in the United States and elsewhere;

(f)     Valeo Japan Co. Ltd. agreed to plead guilty and to pay a $13.6 million criminal fine for its participation in a conspiracy to allocate the supply of, rig bids for, and to fix, stabilize and maintain the pries of air conditioning systems sold to motor vehicle manufacturers in the United States and elsewhere;

(g)     JTEKT Corporation agreed to plead guilty and to pay a $103.27 million criminal fine for its participation in a conspiracy to allocate markets, to rig bids for, and to fix, stabilize and maintain the prices of bearings and electric powered steering assemblies sold to motor vehicle manufacturers in the United States and elsewhere;

(h)     NSK Ltd. agreed to plead guilty and to pay a $68.2 million criminal fine for its participation in a conspiracy to allocate markets, to rig bids for, and to fix, stabilize and maintain the prices of bearings sold to a motor vehicle manufacturer in the United States and elsewhere; and

49

(i)     Yamashita Rubber Co. Ltd. agreed to plead guilty and to pay a $11 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, raise and maintain the prices of anti-vibration rubber products sold in the United States and elsewhere to motor vehicle manufacturers.

155.    On the same day, September 26, 2013, United States Attorney General Eric Holder in the Antitrust Division presented the DOJ's most recent findings in the ongoing motor vehicle parts investigation.  He stated, "These international price-fixing conspiracies affected more than $5 billion in automobile parts sold to U.S. car manufacturers."  Holder also described how the conspiracies worked:

> "Company executives met face to face in the United States and Japan—and talked on the phone—to reach collusive agreements to rig bids, fix prices and allocate the supply of auto parts sold to U.S. car companies.  In order to keep their illegal conduct secret, they used code names and met in remote locations.  Then they followed up with each other regularly to make sure the collusive agreements were being adhered to."

156.    The diagram below, which was prepared by the DOJ, illustrates the September 26, 2013 guilty pleas and the corresponding vehicle parts to which the various motor vehicle manufacturers have admitted price-fixing.

DM1\7333972 1



157.    On October 9, 2013, Takata Corporation announced that it had agreed to pay

$71.3 million to settle antitrust charges brought by the United States federal prosecutors for its

role in a conspiracy to price-fix seatbelts.

158.    On November 26, 2013, the DOJ announced that Toyo Tire & Rubber Co. Ltd.

had agreed to plead guilty and to pay a $120 million criminal fine for its role in two (2) separate

conspiracies to fix the prices of components involving anti-vibration rubber and driveshaft parts

installed in motor vehicles sold in the United States and elsewhere.

159.    On November 27, 2013, the DOJ announced that Stanley Electric Co. Ltd. had

agreed to plead guilty and to pay a $1.44 million criminal fine for its participation in a

conspiracy to fix prices of High-Intensity Discharge (HID) lamp ballasts sold to Toyota Motor

Corp., Nissan Motor Corp., and Fuji Heavy Industries Ltd. and certain of their subsidiaries,

affiliates, and suppliers and installed in vehicles sold in the United States and elsewhere.

DM1\7333972 1

160.    On January 16, 2014, the DOJ announced that Koito Manufacturing Co. Ltd. had agreed to plead guilty and to pay a $56.6 million criminal fine for its roles in separate price-fixing conspiracies involving motor vehicle lighting fixtures and High-Intensity Discharge (HID) lamp ballasts installed in motor vehicles sold in the United States and elsewhere.

161.    On February 3, 2014, the DOJ announced that Aisan Industry Co. Ltd. had agreed to plead guilty and to pay a $6.86 million criminal fine for its role in a price-fixing conspiracy involving electronic throttle bodies sold to Nissan Motor Co. Ltd. and certain of its subsidiaries in the United States and elsewhere.

162.    On February 13, 2014, the DOJ announced that Bridgestone Corp. had agreed to plead guilty and to pay a $425 million criminal fine for its role in a conspiracy to fix prices of anti-vibration rubber parts sold to Toyota Motor Corp., Nissan Motor Corp., Fuji Heavy Industries Ltd., Suzuki Motor Corp., Isuzu Motors Ltd., and certain of their subsidiaries, affiliates, and suppliers and installed in motor vehicles sold in the United States and elsewhere.

163.    On April 23, 2014, the DOJ announced that Showa Corp. agreed to plead guilty and to pay a $19.9 million criminal fine for its role in a conspiracy to fix prices and rig bids for pinion-assist type electric powered steering assemblies sold to Honda Motor Co. Ltd. and certain of its subsidiaries and installed in motor vehicles sold in the United States and elsewhere.

164.    On August 19, 2014, the DOJ announced that NGK Spark Plug Co. Ltd. agreed to plead guilty and to pay a $52.1 million criminal fine for its role in a conspiracy to fix prices and rig bids for spark plugs, standard oxygen sensors, and air fuel ratio sensors sold to manufacturers such as DaimlerChrysler AG, Honda Motor Co. Ltd., and Toyota Motor Corp. and installed in motor vehicles sold in the United States and elsewhere.

165.    On September 29, 2014, the DOJ announced that Toyoda Gosei Co., Ltd., a vehicle parts manufacturer based in Japan, agreed to plead guilty and pay a $26 million criminal fine for its role in conspiracies to fix prices and rig bids for hoses, airbags, and steering wheels sold to motor vehicle manufacturers such as Toyota Motor Corp., Fuji Heavy Industries Ltd., and certain of their subsidiaries, affiliates, and suppliers in the United States and elsewhere.

166.    On November 13, 2014, the DOJ announced that Aisin Seiki Co. Ltd. agreed to plead guilty and to pay a $35.8 million criminal fine for its role in a conspiracy to allocate customers of variable valve timing devices sold to various manufacturers including General Motors Company, Nissan Motor Company Ltd., Volvo Car Corporation, and BMW AG, in the United States and elsewhere.

167.    On November 14, 2014, the DOJ announced that a federal grand jury returned a one-count indictment against two (2) executives of NSK Ltd. and JTEKT Corporation for conspiring to fix the prices of bearings sold to Toyota Motor Corporation and Toyota Motor Engineering & Manufacturing North America Inc. in the United States and elsewhere, through at least July 2011.

168.    On November 24, 2014, Continental Automotive Electronics LLC and Continental Automotive Korea Ltd. agreed to plead guilty and pay a single criminal fine of $4 million for their roles in a conspiracy to rig bids of instrument panel clusters sold to Hyundai Motor Co., Kia Motors Corp. and Kia Motors Manufacturing Georgia in the United States and elsewhere.

169.    On December 1, 2014, the DOJ announced that a former executive of Mitsuba Corporation agreed to plead guilty and serve thirteen (13) months in a U.S. prison for conspiring

to fix the prices of windshield wiper systems and starter motors sold to Honda Motor Co. Ltd. and its subsidiaries and affiliates in the United States and elsewhere.

170.    On December 1, 2014, the DOJ announced that an executive of T.RAD Co. Ltd. agreed to plead guilty and to serve one (1) year and one (1) day in a U.S. prison for participating in a conspiracy to fix princes of radiators sold to Honda Motor Co. Ltd. and certain of its subsidiaries in the United States and elsewhere.

171.    On January 6, 2015, the DOJ announced that a former executive of Toyoda Gosei Co. Ltd. agreed to plead guilty and to serve one (1) year and one (1) day in a U.S. prison for his role in a conspiracy to fix prices and rig bids of automotive hoses sold to Toyota Motor Corp. and certain of its subsidiaries, affiliates and suppliers in the United States.

172.    On January 22, 2015, the DOJ announced that a Detroit federal grand jury returned a one-count indictment against an executive at Takata Corp. for conspiring to rig bids for, and to fix, stabilize and maintain the prices of, seatbelts sold to Toyota Motor Corp., Honda Motor Company Ltd., Nissan Motor Co., Ltd., Mazda Motor Corp., Fuji Heavy Industries Ltd., and/or certain of their subsidiaries, for installation in vehicles manufactured and sold in the United States and elsewhere, through at least February 2011.

173.    On January 27, 2015, the DOJ announced that Sanden Corp. agreed to plead guilty and to pay a $3.2 million criminal fine for its role in a conspiracy to suppress and eliminate competition for the purchase of compressors used in air conditioning systems sold to Nissan North America Inc. for installation in vehicles manufactured and sold in the United States and elsewhere.

174.    On February 5, 2015, the DOJ announced that a Detroit federal grand jury returned a two-count indictment against two (2) former executives of Mitsuba Corporation for

54

their role in conspiring to fix the prices of various vehicle parts, including windshield wiper systems and components, sold to Honda Motor Company Ltd., Nissan Motor Co., Ltd., Toyota Motor Co., Ltd., Chrysler Group, LLC, and Fuji Heavy Industries Ltd., and certain of their subsidiaries in the United States and elsewhere.  The executives are also charged with knowingly and corruptly persuading, and attempting to persuade, employees of Mitsuba to destroy documents and delete electronic data that may contain evidence of antitrust crimes in the United States and elsewhere.

175.    On March 31, 2015, the DOJ announced that Robert Bosch GmbH agreed to plead guilty and to pay a $57.8 million criminal fine for its role in a conspiracy to fix prices and rig bids for spark plugs, oxygen sensors, and starter motors to vehicle and internal combustion engine manufacturers such as DaimlerChrysler AG, Ford Motor Company, General Motors Company, and Adreas Stihl AG & Co., among others, in the United States and elsewhere, until at least July 2011.  Bosch was also charged with participating in a conspiracy to allocate the supply of, rig bids for, and to fix, stabilize and maintain the prices of, starter motors sold to Volkswagen AG and certain subsidiaries in the United States through at least June 2010.

176.    On April 23, 2015, an executive of Defendant Hitachi Automotive Systems Ltd. pleaded guilty and was sentenced to serve fifteen (15) months in a U.S. prison for his role in conspiring to allocate the supply of, rig bids for, and fix, stabilize, and maintain the price of various parts, including starter motors, alternators, air flow meters, valve timing control devices, fuel injection systems, electronic throttle bodies, ignition coils and inverters and/or motor generators, to manufacturers including Ford Motor Co., General Motors LLC, Nissan Motor Co. Ltd., Toyota Motor Corp., and Honda Motor Co. Ltd., and certain of their subsidiaries.

DM1\7333972 1

177.   On April 28, 2015, the DOJ announced that Yamada Manufacturing Co. Ltd. agreed to plead guilty and to pay a $2.5 million criminal fine for its role in a conspiracy to fix prices and rig bids for manual steering columns sold to certain subsidiaries of Honda Motor Co. in the United States and elsewhere, continuing until as late as September 2012.

178.   On May 14, 2015 the DOJ announced that a Detroit federal grand jury returned a one-count indictment against the former executive managing director of T.RAD Co. Ltd. for his role in conspiring to fix the prices of radiators sold to Honda Motor Co. Ltd., Toyota Motor Corp., and certain of their subsidiaries in the United States and elsewhere.

179.   To date, thirty-five (35) companies pleaded or agreed to plead guilty and fifty-five (55) individuals have been charged in the Antitrust Division's ongoing investigation into price fixing and bid rigging in the motor vehicle parts industry.  All together, the thirty-five (35) guilty-pleading companies have paid or agreed to pay approximately $2.5 billion in criminal fines.

### G.  Investigations Involving the Sale of Truck and Equipment Parts

180.   The first public announcements of government investigations and penalties that indicated that the motor vehicle parts conspiracies may have involved parts for products other than passenger automobiles was on March 29, 2013, when the Japanese Fair Trade Commission ("JFTC") issued cease-and-desist orders and surcharge payment orders based on violations of the Japan Antimonopoly Act against NTN Corp., NSK Ltd. and Nachi-Fujikoshi Corp., for conspiring to fix prices on "*industrial machinery bearings* and automotive bearings."

181.   The first public announcements of government investigations and penalties that indicated that the motor vehicle parts conspiracies involved parts for Trucks was on March 19, 2014, when the EC announced that the "producers of car *and truck* bearings" had operated a cartel in the market for bearings sold to "car, *truck* and car part manufacturers.*"  The EC fined

SKF, Schaeffler, NSK Ltd., Nachi-Fujikoshi, and NTN EUR 953 million.  JTEKT, which also

was found to have conspired to fix prices, benefitted from immunity for having revealed the

existence of a cartel to the EC.

182.    On March 31, 2015, the DOJ announced that Robert Bosch GmbH had agreed to

plead guilty and to pay a $57.8 million criminal fine for its role in a conspiracy to fix the prices

for parts, including spark plugs, oxygen sensors and starter motors "sold to automobile *and*

*internal combustion engine manufacturers* in the United States and elsewhere," including parts

sold to equipment manufacturer Andreas Stihl AG & Co., from at least as early as January 2000

until at least July 2011.

## H.   Likely Existence of An Amnesty Applicant

183.    The Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA")

provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily discloses

its conduct to the DOJ.  In most recent cases in which guilty pleas for price-fixing conduct have

been obtained, there has been a cooperating party who has been accepted into the DOJ's

ACPERA program as an amnesty applicant.  One of the leniency benefits for a conspirator that is

accepted into the ACPERA program is that the applicant is not charged with a criminal offense

and is not required to plead guilty to criminal charges.

184.    In light of the multiple guilty pleas in this case, in related vehicle parts antitrust

cases and the DOJ's ongoing investigation into the industry, it is reasonable for this Court to

infer that there is an ACPERA "amnesty applicant" in this case.

## I.   Damage to Plaintiffs and Other Truck and Equipment Dealers Caused by Defendants' Illegal Activities.

185.    Deputy Assistant Attorney General Scott Hammond stated that the motor vehicle

parts cartel is "the biggest [cartel] with respect to the impact on U.S. business and consumers."

DM1\7333972 1

186.    Alternators and Starters and many of the motor vehicle parts involved in the government investigations and proceedings are also used in connection with Trucks and Equipment.

187.    Defendants' conspiracy resulted in Defendants charging inflated prices to firms who directly purchased Alternators and Starters from them and in those purchasers raising their prices to subsequent purchasers.

188.    Having paid higher prices for components of the Trucks and Equipment they sold to Plaintiffs and the Classes and the Alternators and Starters they sold to Plaintiffs and the Classes, firms who sold such Alternators and Starters and Trucks and Equipment passed Defendants' overcharges on to Plaintiffs and the Classes.

189.    Defendants' conspiracy impacted the market for Trucks and Equipment.

190.    Many OEMs identified as having purchased products from members of the cartel, including Toyota, Ford, Chrysler, Mitsubishi Motors, Fuji Heavy Industries, Honda, Subaru, Isuzu and Nissan, manufacture and sell Trucks and/or Equipment directly or through subsidiaries or affiliated companies.

191.    Upon information and belief, many of the Defendants' employees who were involved in negotiating the prices of Alternators and Starters and other parts sold to automobile OEMs were the very same individuals involved in negotiations over the pricing on sales of the same parts for Trucks and Equipment.

192.    The impact of Defendants' conspiracy on Plaintiffs' businesses was substantial. Plaintiffs and similarly situated Truck and Equipment dealers were substantially injured because they paid higher prices for Trucks and Equipment as a result of the Defendants' conspiracy.

DM1\7333972 1

193.    Plaintiffs and similarly situated Truck and Equipment dealers had to and did absorb a significant portion of the overcharges that they paid due to Defendants' illegal activities.  Plaintiffs and similarly situated Truck and Equipment dealers did not "pass on" to their customers all of the overcharges or higher but for prices caused by Defendants' illegal activities.

194.    Plaintiffs have standing, and have suffered damage, in the states where they reside and/or sold Trucks and Equipment, compensable by indirect purchaser laws, and they and members of the classes they seek to represent have sustained significant damage and injury as a result of Defendants' conspiracy and unlawful and unfair trade practices.

## CLASS ACTION ALLEGATIONS

195.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All dealers of heavy-duty (Class 8) trucks, medium-duty (Class 3, 4, 5, 6 & 7) trucks, buses, commercial vehicles (excluding automobiles, light trucks, vans, sports utility vehicles, and/or similar motor vehicles sold by automobile dealers), construction equipment, mining equipment, agricultural equipment (including ATVs designed and/or marketed for agricultural use), railway vehicles, materials handling vehicles, and other similar vehicles that during the Class Period purchased Trucks or Equipment containing Alternators or Starters manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

196.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the antitrust, unfair competition, unjust enrichment, and consumer protection laws of the states whose laws are set forth in the Second and Third Claims for Relief below (except California as to unjust enrichment claims), as well as the unjust enrichment laws of Missouri, Massachusetts, Illinois and South Carolina.  The states whose laws are set forth in the Second and Third Claims

for Relief below, as well as Missouri, Massachusetts, and Illinois, are collectively referred to as the "Indirect Purchaser States." These claims are brought by Plaintiffs on behalf of themselves and entities in the Indirect Purchaser States listed in the Second and Third Claims for Relief as follows (the "Damages Class"):

> All dealers of heavy-duty (Class 8) trucks, medium-duty (Class 3, 4, 5, 6 & 7) trucks, buses, commercial vehicles (excluding automobiles, light trucks, vans, sports utility vehicles, and/or similar motor vehicles sold by automobile dealers), construction equipment, mining equipment, agricultural equipment (including ATVs designed and/or marketed for agricultural use), railway vehicles, materials handling vehicles, and other similar vehicles in the Indirect Purchaser States, that, during the Class Period purchased Trucks or Equipment containing Alternators or Starters manufactured by one of the Defendants or any current or former subsidiary, affiliate thereof or coconspirator.

197.    Alternatively, Plaintiffs bring these claims on behalf of all persons similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure and/or respective state statute(s), on behalf of all members of the following classes (collectively, the "State Classes"), referred to together with the Damages Class as "Damages Classes":

(a)    **Arizona**:  All Truck and Equipment dealers that, during the period June 1, 2000 to the present, purchased Trucks and/or Equipment containing Alternators or Starters manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(b)    **Arkansas**: All Truck and Equipment dealers that, during the period June 1, 2000 to the present, purchased Trucks and/or Equipment containing Alternators or Starters manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(c)    **California:**  All Truck and Equipment dealers that, during the period June 1, 2000 to the present, purchased Trucks and/or Equipment containing Alternators or Starters

manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(d)　　**District of Columbia:**　All Truck and Equipment dealers that, during the period June 1, 2000 to the present, purchased Trucks and/or Equipment containing Alternators or Starters manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(e)　　**Florida:**　All Truck and Equipment dealers that, during the period June 1, 2000 to the present, purchased Trucks and/or Equipment containing Alternators or Starters manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(g)　　**Illinois:**　All Truck and Equipment dealers that, during the period June 1, 2000 to the present, purchased Trucks and/or Equipment containing Alternators or Starters manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(h)　　**Iowa:**　All Truck and Equipment dealers that, during the period June 1, 2000 to the present, purchased Trucks and/or Equipment containing Alternators or Starters manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(i)　　**Kansas:**　All Truck and Equipment dealers that, during the period June 1, 2000 to the present, purchased Trucks and/or Equipment containing Alternators or Starters manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(j)　　**Maine:**　All Truck and Equipment dealers that, during the period June 1, 2000 to the present, purchased Trucks and/or Equipment containing Alternators or Starters manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(k)　　**Massachusetts:**　All Truck and Equipment dealers that, during the period June 1, 2000 to the present, purchased Trucks and/or Equipment containing Alternators or Starters

61

manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(l)     **Michigan:**  All Truck and Equipment dealers that, during the period June 1, 2000 to the present, purchased Trucks and/or Equipment containing Alternators or Starters manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(m)     **Minnesota:**  All Truck and Equipment dealers that, during the period June 1, 2000 to the present, purchased Trucks and/or Equipment containing Alternators or Starters manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(n)     **Mississippi:**  All Truck and Equipment dealers that, during the period June 1, 2000 to the present, purchased Trucks and/or Equipment containing Alternators or Starters manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(o)     **Missouri:**  All Truck and Equipment dealers that, during the period June 1, 2000 to the present, purchased Trucks and/or Equipment containing Alternators or Starters manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(p)     **Nebraska:** All Truck and Equipment dealers that, during the period June 1, 2000 to the present, purchased Trucks and/or Equipment containing Alternators or Starters manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

DM1\7333972 1

(q)     **Nevada:**  All Truck and Equipment dealers that, during the period June 1, 2000 to the present, purchased Trucks and/or Equipment containing Alternators or Starters manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(r)     **New Hampshire:** All Truck and Equipment dealers that, during the period June 1, 2000 to the present, purchased Trucks and/or Equipment containing Alternators or Starters manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(s)     **New Mexico:**  All Truck and Equipment dealers that, during the period June 1, 2000 to the present, purchased Trucks and/or Equipment containing Alternators or Starters manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(t)     **New York:**  All Truck and Equipment dealers that, during the period June 1, 2000 to the present, purchased Trucks and/or Equipment containing Alternators or Starters manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(u)     **North Carolina:**  All Truck and Equipment dealers that, during the period June 1, 2000 to the present, purchased Trucks and/or Equipment containing Alternators or Starters manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(v)     **North Dakota:**  All Truck and Equipment dealers that, during the period June 1, 2000 to the present, purchased Trucks and/or Equipment containing Alternators or Starters manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(w)    **Oregon:**  All Truck and Equipment dealers that, during the period June 1, 2000 to the present, purchased Trucks and/or Equipment containing Alternators or Starters manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(x)    **South Carolina:**  All Truck and Equipment dealers that, during the period June 1, 2000 to the present, purchased Trucks and/or Equipment containing Alternators or Starters manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(y)    **South Dakota:**  All Truck and Equipment dealers that, during the period June 1, 2000 to the present, purchased Trucks and/or Equipment containing Alternators or Starters manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(z)    **Tennessee:**  All Truck and Equipment dealers that, during the period June 1, 2000 to the present, purchased Trucks and/or Equipment containing Alternators or Starters manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(aa)    **Utah:**  All Truck and Equipment dealers that, during the period June 1, 2000 to the present, purchased Trucks and/or Equipment containing Alternators or Starters manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(bb)    **Vermont:**  All Truck and Equipment dealers that, during the period June 1, 2000 to the present, purchased Trucks and/or Equipment containing Alternators or Starters manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

64

(cc)  **West Virginia:**  All Truck and Equipment dealers that, during the period June 1, 2000 to the present, purchased Trucks and/or Equipment containing Alternators or Starters manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(dd)  **Wisconsin:**  All Truck and Equipment dealers that, during the period June 1, 2000 to the present, purchased Trucks and/or Equipment containing Alternators or Starters manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

198.    The Nationwide Class and the Damages Classes are referred to herein as the "Classes."  Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased Alternators or Starters directly from Defendants.

199.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are at least hundreds of members in each Class.

200.    Common questions of law and fact exist as to all members of the Classes.  This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of the Classes, thereby making appropriate relief with respect to the Classes as a whole.  Such questions of law and fact common to the Classes include, but are not limited to the following:

(a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of or rig bids for Alternators and Starters sold in the United States;

(b)    Whether Defendants and their co-conspirators agreed to allocate the supply of Alternators and Starters sold in the United States;

65

(c)     The identity of the participants of the alleged conspiracy;

(d)     The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(e)     Whether the conspiracy violated the Sherman Act, as alleged in First Claim for Relief;

(f)     Whether the conspiracy violated state antitrust and unfair competition laws, as alleged in Second and Third Claims for Relief;

(g)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)     The effect of the conspiracy on the prices of Alternators and Starters sold in the United States during the Class Period;

(i)     Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiffs and the members of the Classes;

(j)     Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Claim for Relief;

(k)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(l)     The appropriate class-wide measure of damages for the Damages Classes.

201.    Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Trucks and Equipment containing Alternators and Starters.

202.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not

antagonistic to, those of the other members of the Classes.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

203.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

204.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other reasons, such treatment will permit a large number of similarly situated entities and persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including the provision to injured entities and persons of a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

205.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

### PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY

206.    Defendants' price-fixing conspiracy had the following effects, among others:

(a) Price competition has been restrained or eliminated with respect to Alternators and Starters;

(b) The prices of Alternators and Starters have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c) Defendants charged purchasers of their Alternators and Starters inflated, fixed and stabilized prices for such Alternators and Starters;

(d) Having paid higher prices for components of the Trucks and Equipment they sold to Plaintiffs and the Classes and the Alternators and Starters they sold to Plaintiffs and the Classes, Truck and Equipment OEMs who sold Trucks and Equipment containing Defendants' Alternators and Starters to Plaintiffs and the Classes passed Defendants' overcharges on to Plaintiffs and the Classes;

(e) Defendants' overcharges passed through each level of distribution as they traveled to Plaintiffs and the Classes; and

(f) Truck and Equipment dealers purchasing Trucks and Equipment containing Alternators and Starters have been deprived of free and open competition.

207. During the Class Period, Plaintiffs and the members of the Classes paid supracompetitive prices for Trucks and Equipment containing Alternators and Starters as a result of Defendants' conspiracy.

208. An increase in the prices of Alternators and Starters caused an increase in the price of Trucks and Equipment containing Alternators and Starters during the Class Period.

209. The markets for Alternators and Starters and the market for vehicles, including Trucks and Equipment, are inextricably linked and intertwined because the market for Alternators and Starters exists to serve the vehicle market. Without the vehicles, the Alternators and Starters have little to no value because they have no independent utility and must be inserted into vehicles to serve any function. Indeed, the demand for vehicles creates the demand for Alternators and Starters.

210.    Alternators and Starters are identifiable, discrete physical products that remain essentially unchanged when incorporated into a Vehicle and are not altered during the manufacturing process.  As a result, Alternators and Starters follow a traceable physical chain of distribution from the Defendants to Plaintiffs and the members of the Classes, and any costs attributable to Alternators and Starters can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

211.    Just as Alternators and Starters can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of Alternators and Starters affect prices paid by indirect purchasers of new Trucks and Equipment containing Alternators and Starters.

212.    Alternators and Starters have their own part numbers, which permit them to be tracked.

213.    Alternators and Starters are pieces of sophisticated equipment that are necessary to operate a Vehicle.

214.    Alternators and Starters are found in every modern motor vehicle.

215.    The Alternators and Starters subject to Defendants' conspiracy and at issue in this lawsuit only have one use:  to be inserted into vehicles, including Trucks and Equipment.

216.    Alternators and Starters comprise a not insignificant portion of the cost of Trucks and Equipment.

217.    The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, rig, or stabilize the price of Alternators and Starters and, as a direct and foreseeable result, the price of new Vehicles containing Alternators and Starters. Economists have developed techniques to isolate and understand the relationship between one

"explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously.  That analysis—called regression analysis—is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product or service that is an assemblage of costs.  Thus, it is possible to isolate and identify only the impact of an increase in the price of Alternators and Starters on prices for new Trucks and Equipment even though such products contain a number of other components whose prices may be changing over time.  A regression model can explain how variation in the price of Alternators and Starters affects changes in the price of new Trucks and Equipment.  In such models, the price of Alternators and Starters would be treated as an independent or explanatory variable.  The model can isolate how changes in the price of Alternators and Starters impact the price of new Trucks and Equipment containing Alternators and Starters while controlling for the impact of other price-determining factors.

218.    The precise amount of the overcharge impacting the prices of new Trucks and Equipment containing Alternators and Starters can be measured and quantified.  Commonly used and well-accepted economic models can measure both the extent and the amount of the supra-competitive charge passed through the chain of distribution.  Thus, the economic harm to Plaintiffs and members of the Classes can be quantified.

219.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Trucks and Equipment than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount

presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent, and Plaintiffs' and Class members' damages are measureable.

## PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

### A. The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover the Claims.

220. Plaintiffs repeat and re-allege the allegations set forth above.

221. Plaintiffs and the members of the Classes had no knowledge, and could not reasonably have known, that the combination or conspiracy alleged herein may have involved products other than passenger automobiles prior to the public announcement by the Japanese Fair Trade Commission ("JFTC") on March 29, 2013 of investigations and fines in connection with the sale of bearings for industrial machinery.

222. Plaintiffs and the members of the Classes had no knowledge, and could not reasonably have known, that the combination or conspiracy alleged herein involved Trucks or Equipment prior to the public announcement by the European Commission Competition Authority ("EC") on March 19, 2014 of investigations and fines in connection with the sale of bearings to truck manufacturers.

223. Plaintiffs and the members of the Classes had no means of obtaining any facts or information concerning any aspect of Defendants' dealings with OEMs or other direct purchasers, much less the fact that they had engaged in the combination and conspiracy alleged herein with respect to parts for Trucks and Equipment prior to the announcements by the JFTC and EC on March 29, 2013 and March 14, 2014.

224. Although there was disclosure of certain facts indicating that the government investigations involved price-fixing for *automotive* parts, no information in the public domain was available to the Plaintiffs and the members of the Classes that parts for *Trucks and*

*Equipment* were involved in the conspiracy being investigated by the government enforcement agencies prior to the public announcement of the JFTC's and EC's enforcement activity.

225.    Plaintiffs and members of the Classes did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein with respect to parts for Trucks and Equipment until after the announcements of the government investigations by the JFTC and EC on March 29, 2013 and/or March 14, 2014.

226.    Plaintiffs and the members of the Classes are Truck and Equipment dealers who had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered the combination and conspiracy described in this Complaint with respect to Trucks and Equipment until after the public announcement of the JFTC's enforcement activity on March 29, 2013 and the EC's enforcement activity on March 14, 2014.

227.    For these reasons, the statute of limitations as to Plaintiffs' and the Classes' claims did not begin to run, and has been tolled with respect to the claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

## B. Fraudulent Concealment Tolled the Statute of Limitations.

228.    Defendants' agreements, understandings and conspiracies with respect to parts for Trucks and Equipment were kept secret, and Plaintiffs and members of the Classes were unaware of Defendants' unlawful conduct and that they were paying supracompetitive prices for Alternators and Starters in the Trucks and Equipment they purchased throughout the United States during the Class Period until after the public announcement of the JFTC's enforcement activity on March 29, 2013 and the EC's enforcement activity on March 14, 2014.

229.    Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the conspiracy alleged herein with respect to Trucks

72

and Equipment until after the public announcement of the JFTC's enforcement activity on March 29, 2013 and the EC's enforcement activity on March 14, 2014.  Before that time, Plaintiffs and the members of the Classes were unaware of the Defendants' unlawful conduct with respect to Trucks and Equipment, and did not know before then that they were paying supra-competitive prices for Alternators and Starters throughout the United States during the Class Period.  No information, actual or constructive, was ever made available to Plaintiffs and members of the Classes that even hinted to Plaintiffs that they were being injured by the Defendants' unlawful conduct.

230.    The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection prior to the public announcement of the JFTC's enforcement activity on March 29, 2013 and the EC's enforcement activity on March 14, 2014.

231.    By its very nature, Defendants' anticompetitive conspiracy was inherently self-concealing.  Alternators and Starters and vehicles containing Alternators and Starters are not exempt from antitrust regulation, and thus, Plaintiffs reasonably considered the industry for Alternators and Starters for Trucks and Equipment to be a competitive industry.  Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices for Alternators and Starters for Trucks and Equipment prior to the public announcement of the JFTC's enforcement activity on March 29, 2013 and the EC's enforcement activity on March 14, 2014.

232.    As explained in the Informations filed against several of the conspirators, the conspirators concealed their activities from the authorities by using code names and arranging meetings at private residences and remote locations.  Also, certain of the conspirators have plead

guilty to destroying incriminating electronic and paper documents upon learning of government investigations into the automotive parts antitrust conspiracy which further concealed the conspiracy.

233.    As stated in the Information filed against Defendant Hitachi Automotive Systems, Ltd., the Defendants and their co-conspirators employed "measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations."

234.    In addition, two employees of Hitachi, Minoru Kurisaki and Hideyuki Saito were charged by the DOJ with knowingly conspiring to obstruct justice by destroying documents and corruptly persuading, and attempting to persuade others, to destroy documents related to an official proceeding, grand jury investigation, and U.S. agency investigation.  The DOJ also charged Hideyuki Saito with obstruction of justice by knowingly and corruptly persuading or attempting to persuade other employees of Mitsubishi Electric Corporation to destroy or conceal paper documents and delete electronic data that may contain evidence of antitrust crimes in the United States and elsewhere with the intent to impair the objects' availability and integrity for use in official proceedings.

235.    Defendant Mitsuba Corporation also pleaded guilty to a charge of obstruction of justice in which it explicitly admitted to "altering, destroying, mutilating, concealing, covering up, falsifying and making false entries in documents and tangible objects with the intent to impede, obstruction, and influence" the DOJ's investigation into the price-fixing of several automotive parts, including Alternators and Starters.  According to Mitsuba Corporation's plea agreement, in February 2010, three of Mitsuba's senior executives learned that the offices of a co-conspirator had been searched by law enforcement authorities in connection with an investigation of possible antitrust violations, and they directed their subordinates and other

DM1\7333972 1

employees to "conceal and destroy documents and electronic files" in both the United States and Japan. Mitsuba Corporation's plea agreement confirmed that such evidence was concealed and destroyed.

236.    Plaintiffs and the members of the Classes could not have discovered the alleged contract, conspiracy and combination prior to the public announcement of the JFTC's enforcement activity on March 29, 2013 and the EC's enforcement activity on March 14, 2014 by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination and conspiracy.

237.    Throughout the course of the conspiracy, the Defendants met and communicated in secret in order to conceal their conspiracy from the public and avoid detection thereof. Above and beyond their acts in furtherance of the conspiracy, such as acts of bid rigging, Defendants engaged in surreptitious activity such as using code names and meeting at private residences or remote locations. The conspirators also coordinated their pricing in a manner to avoid detection by the OEMs. The exact dates and times of these meetings are within the knowledge of the Defendants, including those Defendants and executives of those Defendants who have pleaded guilty to criminal violations of the Sherman Act.

238.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, including through fraudulent misrepresentations, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed to fix prices on parts for Trucks and Equipment until the

JFTC and EC announced their investigations and enforcement activities included industrial machinery and truck parts.

239.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

### FIRST CLAIM FOR RELIEF

**Violation of Section 1 of the Sherman Act
(on behalf of Plaintiffs and the Nationwide Class)**

240.    Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

241.    The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

242.    At least as early as January 2000 and continuing until at least the filing of this Complaint, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Alternators and Starters, thereby creating anticompetitive effects.

243.    The anticompetitive acts were intentionally directed at the United States market for Alternators and Starters and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Alternators and Starters throughout the United States.

244.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for Alternators and Starters.

245.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased Alternators and Starters have been harmed by being forced to pay inflated, supracompetitive prices for Trucks and Equipment containing Alternators and Starters.

246.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth herein.

247.    Defendants' conspiracy had the following effects, among others:

(a) Price competition in the market for Alternators and Starters has been restrained, suppressed, and/or eliminated in the United States;

(b) Prices for Alternators and Starters sold by Defendants and their coconspirators have been fixed, raised, maintained, and stabilized at artificially high, noncompetitive levels throughout the United States;

(c) Prices for Trucks and Equipment purchased by Plaintiffs and the members of the Nationwide Class containing Alternators and Starters manufactured by Defendants and their co-conspirators were inflated; and

(d) Plaintiffs and members of the Nationwide Class who purchased Alternators and Starters indirectly from Defendants have been deprived of the benefits of free and open competition.

248.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Trucks and Equipment

containing Alternators and Starters than they would have paid and will pay in the absence of the conspiracy.

249.    Plaintiffs and members of the Nationwide Class will continue to be subject to Defendants' price-fixing, bid-rigging, and market allocations, which will deprive Plaintiffs and members of the Nationwide Class of the benefits of free competition, including competitively-priced Trucks and Equipment containing Alternators and Starters.

250.    Plaintiffs and members of the Nationwide Class will continue to lose funds due to overpayment for Trucks and Equipment containing Alternators and Starters because they are required to purchase Trucks and Equipment containing Alternators and Starters to continue to operate their businesses.

251.    Plaintiffs and members of the Nationwide Class continue to purchase Trucks and Equipment containing Alternators and Starters, on a regular basis.

252.    Trucks and Equipment containing Alternators and Starters continue to be sold at inflated and supracompetitive prices.

253.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

254.    Plaintiffs and members of the Nationwide Class will be at the mercy of Defendants' unlawful conduct until the Court orders an injunction.

255.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants preventing and restraining the violations alleged herein.

### SECOND CLAIM FOR RELIEF

**Violation of State Antitrust Statutes**
**(on behalf of Plaintiffs and the Damages Class)**

78

256.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

257.    From as early as January 2000 until at least the filing of this Complaint, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Alternators and Starters in unreasonable restraint of trade and commerce and in violation of the various state antitrust statutes set forth below.

258.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize and/or maintain artificially supracompetitive prices for Alternators and Starters, to rig bids for the sale of Alternators and Starters, and to allocate customers for Alternators and Starters in the United States.

259.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Alternators and Starters at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Alternators and Starters sold in the United States;

(b)    allocating customers and markets for Alternators and Starters in the United States in furtherance of their agreements; and

(c)    participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

260.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease, or stabilize prices and to allocate customers with respect to Alternators and Starters.

261.    Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of the following state antitrust statutes.

DM1\7333972 1

262.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, §§ 44-1401, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Alternators and Starters price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Alternators and Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Trucks and Equipment containing Alternators and Starters.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Arizona Revised Statutes §§ 44-1401, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Arizona Revised Statutes §§ 44-1401, *et seq*.

263.     Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code, §§ 16700, *et seq*.

(a)     During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code § 16720.  Defendants, each of them, have

acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Alternators and Starters at supracompetitive levels.

(b)      The aforesaid violations of California Business and Professions Code § 16720, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Alternators and Starters.

(c)      For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:  (1) Fixing, raising, stabilizing, and pegging the price of Alternators and Starters; and (2) Allocating among themselves the production of Alternators and Starters.

(d)      The combination and conspiracy alleged herein has had, *inter alia,* the following effects upon the commerce of California:  (1) Price competition in the sale of Alternators and Starters has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Alternators and Starters sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased Trucks or Equipment containing Alternators and Starters manufactured by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

(e)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for Trucks and Equipment containing Alternators and Starters than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants' violation

of California Business and Professions Code § 16720, Plaintiffs and members of the Damages

Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant

to California Business and Professions Code § 16750(a).

264.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of District of Columbia Official Code Annotated §§ 28-4501, *et seq*.

(a)    Defendants' combinations or conspiracies had the following effects:  (1)

Alternators and Starters price competition was restrained, suppressed, and eliminated throughout

the District of Columbia; (2) Alternators and Starters prices were raised, fixed, maintained, and

stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and

members of the Damages Class, including those who resided in the District of Columbia and/or

purchased or sold Trucks or Equipment in the District of Columbia, were deprived of free and

open competition, including in the District of Columbia; and (4) Plaintiffs and members of the

Damages Class, including those who resided in the District of Columbia and/or purchased or

sold Trucks or Equipment containing Alternators and Starters in the District of Columbia, paid

supracompetitive, artificially inflated prices for Trucks and Equipment containing Alternators

and Starters, including in the District of Columbia.

(b)    During the Class Period, Defendants' illegal conduct substantially affected

District of Columbia commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

members of the Damages Class have been injured in their business and property and are

threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint

of trade in violation of District of Columbia Official Code Annotated. §§ 28-4501, *et seq*.

DM1\7333972 1

Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Official Code Annotated. §§ 28-4501, *et seq.*

265.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code §§ 553.1, *et seq*.

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Alternators and Starters price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Alternators and Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Trucks and Equipment containing Alternators and Starters.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq*.

266.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated §§ 50-101, *et seq*.

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Alternators and Starters price competition was restrained, suppressed, and eliminated throughout

Kansas; (2) Alternators and Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Trucks and Equipment containing Alternators and Starters.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Statutes Annotated §§ 50-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Statutes Annotated §§ 50-101, *et seq*.

267.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes Annotated 10, §§ 1101, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Alternators and Starters price competition was restrained, suppressed, and eliminated throughout Maine; (2) Alternators and Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition: and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Trucks and Equipment containing Alternators and Starters.

84

(b)      During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Revised Statutes Annotated 10, §§ 1101, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Revised Statutes Annotated 10, §§ 1101, *et seq.*

268.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects:  (1) Alternators and Starters price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Alternators and Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Trucks and Equipment containing Alternators and Starters.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Compiled Laws Annotated §§ 445.771, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Compiled Laws Annotated §§ 445.771, *et seq*.

269.    Defendants have entered into an unlawful agreement in unreasonable restraint of trade in violation of Minnesota Statutes Annotated §§ 325D.49, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Alternators and Starters price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Alternators and Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Trucks and Equipment containing Alternators and Starters.

(b)     During the Class Period Defendants' illegal conduct substantially affected Minnesota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Statutes Annotated §§ 325D.49, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Statutes Annotated §§ 325D.49, *et seq*.

270.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated §§ 75-21-1, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Alternators and Starters price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Alternators and Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class, including those who resided in Mississippi and/or purchased or sold Trucks or Equipment containing Alternators and Starters in Mississippi were deprived of free and open competition, including in Mississippi: and (4) Plaintiffs and members of the Damages Class, including those who resided in Mississippi and/or purchased or sold Trucks or Equipment containing Alternators and Starters in Mississippi paid supracompetitive, artificially inflated prices for Trucks and Equipment containing Alternators and Starters, including in Mississippi.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Annotated § 75-21-1, *et seq.*

271.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects:  (1) Alternators and Starters price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Alternators and Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Trucks and Equipment containing Alternators and Starters.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq*.

272.      Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated §§ 598A.010, *et seq*.

(a)      Defendants' combinations or conspiracies had the following effects:  (1) Alternators and Starters price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Alternators and Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or purchased or sold Trucks or Equipment in

88

Nevada, were deprived of free and open competition including in Nevada; and (4) Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or purchased or sold Trucks or Equipment in Nevada, paid supracompetitive, artificially inflated prices for Trucks and Equipment containing Alternators and Starters, including in Nevada.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Revised Statutes Annotated §§ 598A.060, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Revised Statutes Annotated §§ 598A.010, *et seq*.

273.     Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Alternators and Starters price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Alternators and Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Trucks and Equipment containing Alternators and Starters.

(b)     During the Class Period Defendants' illegal conduct substantially affected New Hampshire commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*. for damages incurred by Plaintiffs and members of the Damages Class on or after January 1, 2008.

274.     Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated §§ 57-1-1, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Alternators and Starters price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Alternators and Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Trucks and Equipment containing Alternators and Starters.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

DM1\7333972 1

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Statutes Annotated §§ 57-1-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Statutes Annotated §§ 57-1-1, *et seq*.

275.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Laws §§ 340, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Alternators and Starters price competition was restrained, suppressed, and eliminated throughout New York; (2) Alternators and Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, including those who resided in New York and/or purchased or sold Trucks or Equipment containing Alternators and Starters in New York, were deprived of free and open competition, including in New York; and (4) Plaintiffs and members of the Damages Class, including those who resided in New York, paid supracompetitive, artificially inflated prices for Trucks and Equipment containing Alternators and Starters when they purchased, including in New York, Trucks or Equipment containing Alternators and Starters, or purchased, including in New York, Trucks or Equipment containing Alternators and Starters that were otherwise of lower quality, than would have been absent the conspirators' illegal acts, or were unable to purchase Trucks or Equipment containing Alternators and Starters that they would have otherwise have purchased absent the illegal conduct.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, New York General Business Laws §§ 340, *et seq*.  The conduct set forth above is a *per se* violation of the Act.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York General Business Laws §§ 340, *et seq*.

276.    Defendants have entered into an unlawful agreement in restraint of trade in violation of North Carolina General Statutes §§ 75-1, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Alternators and Starters price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Alternators and Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased or sold Trucks and Equipment containing Alternators and Starters in North Carolina, were deprived of free and open competition, including in North Carolina; and (4) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased or sold Trucks or Equipment containing Alternators and Starters in North Carolina, paid supracompetitive, artificially inflated prices for Trucks and Equipment containing Alternators and Starters including in North Carolina.

DM1\7333972 1

(b)     During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(c)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina General Statutes §§ 75-1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina General Statutes §§ 75-1, *et seq*.

277.    Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code §§ 51-08.1-01, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Alternators and Starters price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Alternators and Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Trucks and Equipment containing Alternators and Starters.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)       By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Century Code §§ 51-08.1-01, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Century Code §§ 51-08.1-01, *et seq*.

278.       Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*.

(a)       Defendants' combinations or conspiracies had the following effects:  (1) Alternators and Starters price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Alternators and Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Trucks and Equipment containing Alternators and Starters.

(b)       During the Class Period Defendants' illegal conduct had a substantial effect on Oregon commerce.

(c)       As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)       By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq*.

DM1\7333972 1

279.    Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws Annotated §§ 37-1-3.1., *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Alternators and Starters price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Alternators and Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased or sold Trucks or Equipment containing Alternators and Starters in South Dakota, were deprived of free and open competition including in South Dakota; and (4) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased or sold Trucks or Equipment containing Alternators and Starters in South Dakota, paid supracompetitive, artificially inflated prices for Trucks and Equipment containing Alternators and Starters including in South Dakota.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Annotated §§ 37-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Annotated §§ 37-1, *et seq.*

280.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated §§ 47-25-101, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Alternators and Starters price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Alternators and Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Trucks and Equipment containing Alternators and Starters.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Annotated §§ 47-25-101, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Annotated §§ 47-25-101, *et seq*.

281.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Alternators and Starters price competition was restrained, suppressed, and eliminated throughout Utah; (2) Alternators and Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class

96

paid supracompetitive, artificially inflated prices for Trucks and Equipment containing Alternators and Starters.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-3101, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-3101, *et seq.* for damages incurred by Plaintiffs and members of the Damages Class on or after May 1, 2006.

282.     Defendants have entered into an unlawful agreement in restraint of trade in violation of 9 Vermont Statutes Annotated §§ 2451, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Alternators and Starters price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Alternators and Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Trucks and Equipment containing Alternators and Starters.

(b)     During the Class Period Defendants' illegal conduct had a substantial effect on Vermont commerce.

97

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 9 Vermont Statutes Annotated §§ 2451, *et seq*.  Plaintiffs are entitled to relief pursuant to 9 Vermont Statutes Annotated § 2465 and any other applicable authority. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under 9 Vermont Statutes Annotated §§ 2451, *et seq*.

283.     Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Alternators and Starters price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Alternators and Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased or sold Trucks or Equipment containing Alternators and Starters in West Virginia, were deprived of free and open competition including in West Virginia; and (4) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased or sold Trucks or Equipment containing Alternators and Starters in West Virginia, paid supracompetitive, artificially inflated prices for Trucks and Equipment containing Alternators and Starters including in West Virginia.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq.*

284.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Wisconsin Statutes §§ 133.01, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Alternators and Starters price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Alternators and Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Trucks and Equipment containing Alternators and Starters.

(b)     During the Class Period Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Statutes §§ 133.01, *et seq.*  Accordingly, Plaintiffs and

99

members of the Damages Class seek all relief available under Wisconsin Statutes §§ 133.01, *et seq*.

286. Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement. Plaintiffs and members of the Damages Class have paid more for Trucks and Equipment containing Alternators and Starters than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

286. In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

287. Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## THIRD CLAIM FOR RELIEF

### Violation of State Consumer Protection Statutes
### (on behalf of Plaintiffs and the Damages Class)

288. Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

289. Defendants knowingly engaged in unlawful, unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

100

290.    Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of Arkansas Code Annotated § 4-88-101.

(a)    Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Alternators and Starters were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)    The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

(c)    Defendants' unlawful conduct had the following effects:  (1) Alternators and Starters price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Alternators and Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for Trucks and Equipment containing Alternators and Starters.

(d)    During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

(e)    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

291.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

(a)     During the Class Period, Defendants marketed, sold, or distributed Alternators and Starters in California, and committed and continue to commit acts of unfair competition, as defined by California Business and Professions Code § 17200, *et seq.*, by engaging in the acts and practices specified above.

(b)     During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers.

(c)     This claim is instituted pursuant to California Business and Professions Code §§ 17203 and 17204, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

(d)     The Defendants' conduct as alleged herein violated Section 17200.  The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code § 17200, *et seq.,* including, but not limited to, the following:  (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the

102

violations of Section 16720, *et seq.,* of the California Business and Professions Code, set forth above;

(e)     Defendants' acts, omissions, misrepresentations, practices, and nondisclosures, as described above, whether or not in violation of California Business and Professions Code § 16720, *et seq.*, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

(f)     Defendants' acts or practices are unfair to purchasers and resellers of Trucks and Equipment containing Alternators and Starters in the State of California within the meaning of California Business and Professions Code § 17200; and

(g)     Defendants' unlawful conduct had the following effects: (1) Alternators and Starters price competition was restrained, suppressed, and eliminated throughout California; (2) Alternators and Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3) Plaintiffs and members of the Damages Class, including those who resided in California and/or purchased or sold Trucks or Equipment containing Alternators and Starters in California, were deprived of free and open competition, including in California; and (4) Plaintiffs and members of the Damages Class, including those who resided in California and/or purchased or sold Trucks or Equipment containing Alternators and Starters in California, paid supracompetitive, artificially inflated prices for Trucks and Equipment containing Alternators and Starters, including in California.

(h)     Defendants' acts and practices are unlawful, fraudulent or deceptive within the meaning of California Business and Professions Code § 17200.

(i)     The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

(j)     The unlawful, fraudulent, deceptive, and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the Damages Class to pay supracompetitive and artificially-inflated prices for Trucks and Equipment containing Alternators and Starters.  Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

(k)     As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code §§ 17203 and 17204.

292.     Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Statutes §§ 501.201, *et seq.*

(a)     Defendants' unlawful conduct had the following effects:  (1) Alternators and Starters price competition was restrained, suppressed, and eliminated throughout Florida; (2) Alternators and Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Trucks and Equipment containing Alternators and Starters; and (5) Plaintiffs and members of the Damages Class, who were reasonable parties

who purchased and/or sold in Florida, were deceived into believing that they were paying competitive prices for Trucks and Equipment containing Alternators and Starters.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      Defendants have engaged in unfair competition or unlawful, unfair or deceptive acts or practices in violation of Florida Statutes § 501.201, *et seq.,* and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

293.      Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of New Mexico Statutes Annotated § 57-12-1, *et seq*.

(a)      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Alternators and Starters were sold, distributed, or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)      Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Alternators and Starters.  Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.  Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing Alternators and

Starters because they were unaware of the unlawful overcharge and because they had to purchase Defendants' Alternators and Starters, which were a necessary and integrated component of the Trucks and Equipment purchased by Plaintiffs and members of the Damages Class. Defendants' conduct with regard to sales of Alternators and Starters, including their illegal conspiracy to secretly fix the price of Alternators and Starters at supracompetitive levels and overcharge purchasers of Trucks and Equipment containing those Alternators and Starters, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs, the other members of the Damages Class, and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class.

(c)     The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of New Mexico Statutes Annotated § 57-12-3, in that such conduct, *inter alia,* resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for Trucks and Equipment containing Alternators and Starters as set forth in New Mexico Statutes Annotated § 57-12-2E, due to the inflated prices paid by Plaintiffs and Class members for Trucks and Equipment containing Alternators and Starters.

(d)     Defendants' unlawful conduct had the following effects: (1) Alternators and Starters price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Alternators and Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for Trucks and Equipment containing Alternators and Starters.

DM1\7333972 1

(e)     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

(f)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

(g)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Statutes Annotated § 57-12-1, *et seq.,* and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

294.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of New York General Business Laws § 349, *et seq.*

(a)     Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Alternators and Starters were sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     Defendants deceptively led purchasers of Trucks and Equipment containing Alternators and Starters, including Plaintiffs and Class members, to believe that the Alternators and Starters they had purchased as integrated components of Trucks and Equipment had been sold at legal competitive prices, when they had in fact been sold at collusively obtained inflated prices, that were passed on to Plaintiffs and Class members.

(c)     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of New York General Business Laws § 349, which resulted in injuries to purchasers and broad adverse impact on the public at large, and

harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

(d)     Because of Defendants' unlawful trade practices in the State of New York, New York purchasers who indirectly purchased Alternators and Starters were misled to believe that they were paying a fair price for Trucks and Equipment containing Alternators and Starters or the price increases for Trucks and Equipment containing Alternators and Starters were for valid business reasons, and similarly situated purchasers were potentially affected by Defendants' conspiracy.

(e)     Defendants' unlawful conduct had the following effects:  (1) price competition for Alternators and Starters was restrained, suppressed, and eliminated throughout New York; (2) prices of Alternators and Starters were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, who resided in and/or purchased or sold Trucks or Equipment containing Alternators and Starters in New York, were deprived of free and open competition and were subject to Defendants' deceptive practices in New York; and (4) Plaintiffs and members of the Damages Class, who resided in and/or purchased or sold Trucks or Equipment containing Alternators and Starters in New York, paid supracompetitive, artificially inflated prices for Trucks and Equipment containing Alternators and Starters, and were subjected to Defendants' deceptive practices.

(f)     Defendants knew that their unlawful trade practices with respect to pricing Alternators and Starters would have an impact on all purchasers in New York and not just the Defendants' direct customers.

(g)     Defendants knew that their unlawful trade practices with respect to pricing Alternators and Starters would have a broad impact, causing class members who indirectly

purchased Trucks or Equipment containing Alternators and Starters to be injured by paying more for Trucks and Equipment containing Alternators and Starters than they would have paid in the absence of Defendants' unlawful trade acts and practices.

(h)     During the Class Period, Defendants marketed, sold, or distributed Alternators and Starters in New York and their illegal conduct substantially affected New York commerce and New York purchasers.

(i)     During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled manufactured, sold, and/or distributed Alternators and Starters in New York.

(j)     Plaintiffs and members of the Damages Class seek all relief available pursuant to New York General Business Laws § 349(h).

295.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina General Statutes § 75-1.1, *et seq*.

(a)     Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Alternators and Starters were sold, distributed, or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in injuries to purchasers of Trucks and Equipment containing Alternators and Starters, and broad adverse impact on the public at large, and harmed the public interest of North Carolina purchasers in an honest marketplace in which economic activity is conducted in a competitive manner.

DM1\7333972 1

(c)     Defendants' unlawful conduct had the following effects:  (1) price competition for Alternators and Starters was restrained, suppressed, and eliminated throughout North Carolina; (2) prices of Alternators and Starters were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased or sold Trucks or Equipment containing Alternators and Starters in North Carolina, were deprived of free and open competition including in North Carolina; and (4) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased or sold Trucks or Equipment containing Alternators and Starters in North Carolina, paid supracompetitive, artificially inflated prices for Trucks and Equipment containing Alternators and Starters including in North Carolina.

(d)     During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce and purchasers of Trucks and Equipment containing Alternators and Starters. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts.  Secrecy was integral to the formation, implementation, and maintenance of Defendants' price-fixing conspiracy.  Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and Class members could not possibly have been aware.  Moreover, Defendants deceptively concealed their unlawful activities by conducting meetings and conversations in secret.

(e)     During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, marketed, sold and/or distributed Alternators and Starters in North Carolina.

(f)     Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with

further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina General Statutes § 75-1.1, *et seq.,* and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

296.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Statutes Annotated § 2451, *et seq.*

(a)   Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Alternators and Starters were sold, distributed, or obtained in Vermont.

(b)   Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Alternators and Starters.  Defendants owed a duty to disclose such facts, and Defendants breached that duty by their silence.  Defendants misrepresented to all purchasers during the Class Period that Defendants' prices for Alternators and Starters were competitive and fair.

(c)   Defendants' unlawful conduct had the following effects:  (1) price competition for Alternators and Starters was restrained, suppressed, and eliminated throughout Vermont; (2) prices for Alternators and Starters were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Trucks and Equipment containing Alternators and Starters.

(d)   As a direct and proximate result of the Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a

result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

(e)     Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Alternators and Starters, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Alternators and Starters at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont Statutes Annotated § 2451, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**FOURTH CLAIM FOR RELIEF**

**Unjust Enrichment**
**(on behalf of Plaintiffs and the Damages Class)**

297.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

298.    Plaintiffs bring this claim under the laws of all states listed in the Second and Third Claims, *supra,* except California. Plaintiffs also bring this claim under the laws of Missouri, Illinois, Massachusetts, South Carolina, and Tennessee on behalf of the Plaintiffs who have their primary places of business in those states and the class members in those states.

299.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Alternators and Starters.

300.    Defendants have benefited from their unlawful acts, and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the

overpayments made by Plaintiffs or the members of the Damages Class for Alternators and Starters.

301.    Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

302.    Pursuit of any remedies against the firms from whom Plaintiffs and the Class members purchased Trucks and Equipment containing Alternators and Starters subject to Defendants' conspiracy would have been futile, given that those firms did not take part in Defendants' conspiracy.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs respectfully request that:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

B.    The unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

(a)    An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(b)    A *per se* violation of Section 1 of the Sherman Act;

(c)     An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

(d)     Acts of unjust enrichment by Defendants as set forth herein.

C.     Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to be trebled or otherwise enhanced to the extent such laws permit;

D.     Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.     Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

DM1\7333972.1

G.     Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.     Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.     Plaintiffs and the members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs hereby demand trial by jury.


Dated:  November 4, 2015


/s/ J. Manly Parks
Wayne A. Mack
J. Manly Parks
**Duane Morris LLP**
30 S. 17th Street
Philadelphia, PA  19103
Phone: (215) 979-1000
Fax: (215) 979-1020
wamack@duanemorris.com
jmparks@duanemorris.com

*Counsel for Truck and Equipment Dealer Plaintiffs*

115

## <u>CERTIFICATE OF SERVICE</u>

I certify that I served the foregoing First Amended Class Action Complaint on all counsel of record by ECF.

November 4, 2016

/s/ J. Manly Parks